Alabama Coca-Cola Bottling Company, et al. [1] v. Commissioner. Alabama Coca-Cola Bottling Co. v. Commissioner
Docket Nos. 6100-66, 6101-66, 6303-66.
United States Tax Court
T.C. Memo 1969-123; 1969 Tax Ct. Memo LEXIS 172; 28 T.C.M. (CCH) 635; T.C.M. (RIA) 69123; June 18, 1969, Filed *172 Hugh R. Dowling and John W. Mooers, 1824 Barnett Bank Bldg., Jacksonville, Fla., for the petitioners. Vernon J. Owens, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes for the calendar years and in the amounts as follows: Petitioner
1962
1963
1964
Alabama Coca-Cola Bottling Co.
$ 6,670.57
$ 5,932.33
$ 1,400.24
Beaumont Coca-Cola Botting Co.
3,044.77
24,276.12
845.00
Hygela Coca-Cola Bottling Co. [2]
28,293.45
28,537.78
49,326.17
Some of the issues raised by the pleadings have been disposed of by the parties leaving for our decision the following: (1) Whether the cost, including the cost of installation, of certain signs, clocks, and scoreboards to each petitioner during each of the years here in issue are deductible advertising expenses or capital expenditures which should be amortized over an estimated useful life of 5 years, and 636 (2) Whether petitioner, Hygeia Coca-Cola Bottling Co., was *173 availed of during each of the years here in issue for the purpose of avoiding Federal income taxes with respect to its shareholders or the shareholders of any other corporation. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners herein, Alabama Coca-Cola Bottling Company (hereinafter referred to as Alabama), Beaumont Coca-Cola Bottling Company, (hereinafter referred to as Beaumont), and Hygeia Coca-Cola Bottling Company, (hereinafter referred to as Hygeia) are corporations each of which had at the time of the filing of its petition in this case an office and place of business in Pensacola, Florida, this city being the location of the principal office and place of business of Hygeia. Alabama was organized under the laws of the State of Alabama and filed its Federal Corporate income tax returns for the calendar years 1962, 1963, and 1964 with the district director of internal revenue, Birmingham, Alabama. Beaumont which was organized under the laws of the State of Texas, and Hygeia, which was organized under the laws of the State of Florida, each filed its Federal Corporate income tax returns for the taxable years 1962, 1963, and 1964, with *174 the district director of internal revenue at Jacksonville, Florida. Alabama, Beaumont and Hygeia each are now and since their organization have been engaged in bottling and distributing coca-cola and other soft drinks under franchise of the Coca-Cola Company of Atlanta, Georgia, hereinafter referred to as Coke Company. The business of a predecessor company of Hygeia was sold to Charles V. Rainwater (hereinafter referred to as Rainwater) and Henry J. Edmondson (hereinafter referred to as Edmondson) in March of 1924. After acquiring the plant and business of Hygeia's predecessor, Rainwater and Edmondson had Hygeia incorporated under the laws of the State of Georgia. On September 1, 1930, the Georgia corporation was dissolved and Hygeia was incorporated under the laws of the State of Florida and has continued as a Florida corporation. The Hygeia stock was originally issued to Rainwater and Edmondson and it has continued to be held by them, members of their families, trusts created for members of their families or corporations the stock of which is owned or beneficially owned by members of their families. Issue Involving Signs, Scoreboards and Clocks Petitioners financed their advertising *175 through "dealer help advertising funds," "participation funds" and expenditures from their own funds without outside control. [3] The "dealer help advertising fund" is accumulated by an arrangement each petitioner had with The Coke Company, whereby that company made each petitioner an allowance of 5 cents for every gallon of Coca-Cola syrup purchased to establish a fund from which various advertising materials might be purchased from The Coke Company. The only way petitioners could use this fund was to purchase such materials. These materials generally known as "dealer help advertising," included such items as pencils, rulers, blotters, calendars and small decals as well as metal signs of various sizes, "tacker" signs which salesmen carry on their routes, illuminated signs, pole signs, hang-out signs, thermometers, and indoor and outdoor clocks. The "participation fund" is composed of amounts set aside by the bottler for certain *176 types of advertising which are matched by The Coke Company. The Cke Company designates the type of advertising for which these funds may be used. Petitioners also use their own funds without supplement or subsidy from The Coke Company for advertising through the media of newspapers, billboards, radio and by various other methods. The extent and method of such advertising is determined by petitioners without direction by The Coke Company. Among the advertising materials that may be purchased from The Coke Company through the "dealer help advertising fund" are signs and clocks which are placed on or near the properties of retail dealers such as restaurants, grocery stores, and gasoline stations whose merchandise for sale includes Coca-Cola products. A retail dealer (hereinafter referred to as dealer) is not 637 necessarily furnished a particular type of sign he might request. The sales manager of each petitioner is responsible for determining where signs of various types will be located. The sales manager studies the traffic situation and other factors affecting the neighborhood of a dealer in determining whether it is to the best interest of petitioner to place a sign at the particular *177 location. Such factors as competition, whether the sign would be lit at night, and the number of potential viewers of the sign are considered. Signs are placed in the areas which petitioners' sales managers consider most desirable for advertising petitioners' products. Petitioners attempt to obtain the best locations before a competing company utilizes such locations. Many of the signs placed at a dealer's location contain a large "dealer privilege area" where the dealer's name or business is placed. These signs advertise for both the bottling company and the dealer and thereby serve to establish goodwill between the two. During the years here in issue no written contracts were entered into between the dealer and petitioners regarding the ownership of the sign, the length of time the sign would remain on the dealer's premises or maintenance of the sign. [4] However, when a sign was placed on a dealer's premises, petitioners informed the dealer that they would maintain the sign by repairing it, replacing parts and repainting it. When the sign was an illuminated one, the dealer agreed to supply the electricity for the sign and to keep the sign lit for a certain number of hours or until *178 a certain time in the evening. When a sign is placed at the location of a dealer, petitioners consider the sign not subject to their control without the dealer's consent. Some of the dealers consider the signs to become their property one they are installed on their premises while other dealers consider the signs to remain petitioners' property. Notwithstanding the strict question of ownership, petitioners normally attempt to recover signs and clocks placed on a dealer's property if the dealer goes out of business or for some other reason does not want the sign or clock to remain any longer on his premises. If the ownership of a dealer location is changed, petitioners normally either leave the sign, if the new dealer is going to handle Coca-Cola or repossesses it. Generally, when such changes occur, *179 petitioners are asked to make minor repairs or change the dealer's name on the sign. It is not in the best interest of the petitioners to forcibly attempt to remove a clock or sign if a dealer is adamant about retaining it. On those rare occasions none of which occurred during the years here in issue, when a dealer paints over the Coca-Cola trademark on a sign and places his own privilege on it, it is the policy of petitioners to attempt to persuade that dealer to allow them to restore the sign to its original condition or remove it from the dealer's premises. Petitioners have been fairly successful in obtaining the dealer's consent to put the sign back in its original condition or to remove it. Petitioners prefer to recondition the sign and will remove a sign only as a last resort when it is no longer serving its advertising purposes. In 1937, Hygeia was using 18 by 54 inch tacker signs, 3' X 6' metal signs, 4' X 10' metal signs, very small metal stick-out signs, thermometers and some paper signs. The signs used in 1937 and 1938 were quite inexpensive as compared to the illuminated signs with two plastic faces which began to be used in 1961 and were being used in the years here in *180 issue. During the years here in issue, petitioners used various types and sizes of signs for purposes of advertising its products. Petitioners were still using the tacker signs of the same general type that had been used since 1937. They used also during these years hung metal signs including pole and hangout signs which in some instances would be lighted by leaving a spot-light-type light shining in it. Beginning in 1961 petitioner began to use two face plastic illuminated signs and most of the signs used in the years in issue were this type of illuminated sign although some heavy metal signs were used. [5]
The heavy metal signs are generally 3 by 5 feet or 4 by 6 feet in size. One 638 such sign described as a "Rigid D.F." sign is a metal sign which is held against the side of a building by two long prong-type arms. These heavy metal signs are placed on store buildings or on fixtures attached to the building. Another type sign described as a "Boon D.F." is a double-faced sign which is suspended *181 on a long pole that sticks out from a building. Some of these signs have small lights on either side. These heavy metal signs are installed on a dealer's premises either by petitioners' employees or an independent contractor engaged and paid by petitioners. The illuminated signs come in sizes of 3 by 5, 4 by 6, 5 by 7, and 6 by 6 feet. These illuminated signs consist of a wellbuilt metal framework with electrical gear inside producing the lighting for the two outside plastic faces. They are installed either by the petitioners' employees or independent contractors engaged and paid by petitioners. The number of illuminated plastic signs being erected was consistently increasing during the years here in issue while the number of metal signs being erected was decreasing. During the years here in issue the twoface plastic illuminated signs ranged in price from $156.50 to $275.00 each, the heavy metal signs ranged in price from $84.50 to $135.00 each, and the outside and inside clocks containing petitioners' advertising which were installed on the premises of some dealers cost approximately $95 each. Also during the years 1962, 1963, and 1964 in addition to signs and clocks, Alabama purchased *182 five scoreboards costing $113.40, $175, $325, $404, [6] and $1,511, [6] respectively, which were installed on athletic fields of various high schools in its area. Hygeia purchased one such scoreboard costing $435.33, two such scoreboards costing $500 each and two such scoreboards costing $891.58 each. Hygeia in 1962 and 1963 and Alabama in 1962, 1963, and 1964, used their own employees to erect signs and do the necessary repairs thereto such as replacing parts and repainting the signs. In 1964 Hygeia employed Lamar Advertising Company to install signs on the premises of dealercustomers paying that company a total amount of $2,138.10 therefor. During the years in issue, Beaumont engaged an independent contractor to install signs on the premises of its dealer customers. Beaumont paid such independent contractor for this work the amount of $3,902.54, $21,459.58 and $3,172.46 in the years 1962, 1963, and 1964, respectively. Petitioners pursuant to their agreement with dealer-customers kept the signs installed on such dealer-customer's premises in good repair by replacing lights, repainting the faces and replacing or repairing faces when they were *183 destroyed or damaged. The cost to petitioners of making repairs, replacing faces, repainting faces, and changing the names of dealers on signs were charged by petitioners as an expense on their books and records and deducted as such on their Federal income tax returns. [7]
Most damage to signs is caused by vandalism but it is rare for signs to be damaged by vandalism to such an extent that they cannot be repaired. Petitioners attempt to locate signs in places where they will not be subject to vandalism. Occasionally, high winds come in between the faces of a double-faced sign and blow off one of the faces in which event the face would be replaced by petitioners. Some of the signs placed by petitioners on the property of their dealer-customers last longer than 5 years while others would last slightly less than 5 years but the average useful life of these signs is at least 5 years. The signs do not become obsolete within a 5-year period. When a sign is removed for any reason from one location it is examined to determine if it is in good repair and if it is, it is placed at a new *184 location. If it is not in good repair, it is restored to acceptable condition and placed at a secondary location. When a new design or new style of sign becomes available, petitioners often receive requests for the new style sign from dealers having the old style ones. If the location is a prime one for advertising petitioners' product, the old sign is replaced by a new sign and after remodeling or repair, if necessary, a new dealer's privilege is painted on the old sign and it is installed by petitioners at the premises of a dealercustomer in a less desirable location. When a sign is removed from a prime to a secondary location, the combined time during 639 which that sign is used at the two locations is usually 6 or 7 years. A sign placed inside a dealer-customer's business establishment will generally last somewhat longer than a sign placed outside the business establishment. Petitioners advertise their products on the athletic field scoreboards they install. The primary cost of such scoreboards is the electrical apparatus and control timers. If good care is taken of a scoreboard it will normally last ten years. During that period it would probably have to be repainted every year *185 or at least every two years. Occasionally other business firms join with petitioners to purchase a scoreboard for a school. At least since 1930, petitioners on their books and records and Federal income tax returns have treated the costs of signs, including installation costs as an expense deductible in the taxable year when incurred. Petitioners' Federal tax returns have been audited by respondent on a number of occasions prior to the audit for the taxable years here in issue. Respondent on none of the prior audits proposed any change in petitioners deducting as a current expense the cost of signs, including the installation costs of such signs. On its Federal income tax returns for the years 1962, 1963, and 1964, Alabama claimed as part of its deductions for sales and advertising expense the amounts of $2,880, $7,995.42 and $6,058.45, respectively, representing the cost of signs, clocks and scoreboards, including installation costs. [8] *186 Respondent disallowed these claimed deductions, and treated the amounts expended for signs, scoreboards and clocks including installation costs as capital expenditures. Respondent explained his adjustment by stating that "advertising expenses [in these amounts] have been capitalized and amortization was allowed" thereon in the amounts of $255.42, $1,669.82, and $2,885.81 [9] for the years 1962, 1963 and 1964, respectively. The computation of the amounts allowed as amortization was based upon an estimated useful life of five years for the signs, scoreboards, and clocks. On its Federal income tax returns for the years 1962, 1963, and 1964, Beaumont claimed as part of its deduction for sales and advertising expenses the amounts of $5,922.54, $53,584.63 and $5,732.21, respectively, representing the cost of signs and clocks. Respondent in his notice of deficiency disallowed these portions of petitioner's claimed deductions for advertising expense and treated the amounts *187 as capital expenditures allowing amortization thereon in the amounts of $499.87, $7,771.81, and $12,625.86 for the years 1962, 1963, and 1964, respectively. The computation of the amounts of amortization was based upon an estimated useful life of 5 years for the signs and clocks capitalized. In 1962, 1963, and 1964, Hygeia claimed as part of its deductible expenses for sales and advertising the amounts of $2,633.10, [10] *188 $7,008.08 and $21,274.40, respectively, for cost of signs, scoreboards and clocks, including installation costs. Respondent in his notice of deficiency disallowed these claimed deductions stating that these portions of petitioner's claimed deductions for advertising expense constituted capital expenditures. Respondent in his notice of deficiency allowed amortization thereon in the amounts of $235.23, $1,089.18 and $3,836.27 for the years 1962, 1963 and 1964, respectively. Because of certain agreed adjustments the proper amount of amortization under respondent's contention for the year 1964 is $3,764.39. The computation of these amounts of amortization was based on an estimated useful life of five years for the signs, scoreboards, and clocks. Accumulated Earnings Tax Issue By letter dated September 19, 1966, Hygeia was notified of the intention of the respondent to issue a statutory notice of deficiency for the taxable years 1962, 1963 and 1964, setting forth an amount with respect to excessive accumulated earnings tax imposed by section 531 of the Internal Revenue Code of 1954. [11]
On September 28, 1966, respondent mailed a statutory notice of deficiency to Hygeia determining that Hygeia had accumulated earnings income of $88,862.51, $90,709.96 640 and $131,837.49 for the years 1962, 1963, and 1964, respectively. Hygeia submitted a Statement and Protest which was filed on November 15, 1966, in accordance with the provisions of section 534(c), signed by Crawford Rainwater as president of Hygeia on November 14, 1966, making a number of claims for Hygeia's needs in its business of its accumulated earnings and outlining details of plans for a proposed new plant and requirements for new machinery by Hygeia. [12] *189 The capitalization of Hygeia during each of the years in issue consisted of 1,000 shares of $100 par value stock. The Georgia corporation which was formed by Rainwater and Edmondson after they acquired the business of Hygeia's predecessor was authorized to issue capital stock of $100,000, consisting of 1,000 shares of $100 par value stock. The stock was issued, 500 shares each, to Rainwater and Edmondson who were brothers-in-law. On September 1, 1930, when the Georgia corporation was dissolved, and all of its assets and liabilities were transferred to Hygeia, the Florida corporation, the corporate shareholders of Hygeia were as follows: Shareholder
No. of Shares
Charles V. Rainwater
499
Charles V. Rainwater, Executor of the Estate of J. Henry Edmondson
400
Blanche E. Rainwater, wife of Charles V. Rainwater and sister of J. Henry Ed- mondson
100
Joseph Eros 1
Total
1,000
As *190 of the years here in issue Hygeia's stock was owned as As of the years here in issue Hygeia's stock was owned as follows: Shareholder
Relationship
Number of Shares as of December 31,
1962
1963
1964
Beaumont
[1]
62
82
82
Sallie E. Duff
Niece of Martha Brown Edmondson and Blanche Edmondson Rainwater (hereinafter referred to as Blanche)
180
180
180
Martha Brown Edmondson
Sister of Blanche
175
175
175
Edward S. Perkins,
Trustee for Martha
Brown Edmondson
Martha was the sister of Blanche
40
40
40
Lucia E. Perkins
Niece of Martha Brown Edmondson and Blanche
180
180
180
Charles V. Rainwater
Surviving husband of Blanche
50
50
50
Charles V. Rainwater
[2]
313
293
293
Trustee, Estate of Blanche
Edmondson Rainwater
Total
1,000
1,000
1,000 The members of the Board of Directors of Hygeia for the taxable years 1962, 1963 and 1964 were Rainwater, Crawford, Brown Rainwater, a son of Rainwater and a brother of Crawford, Martha Brown Edmondson and Edward S. Perkins. Crawford *191 Rainwater (hereinafter referred to as Crawford) is the son of Charles V. Rainwater who was chairman of the Board of Hygeia during the years here in issue. During the years here in issue Crawford was president of Hygeia. Crawford had been employed by Hygeia since he graduated from college in 1937. Prior to becoming Hygeia's president he was secretary-treasurer of the corporation and had been in that position since 1938. Eugene C. Smith who is not a stockholder or director of Hygeia is its vice president and general manager. From 1937 to 1954 Hygeia bottled and sold six and one-half ounce coca-cola and this was its only product. Since 1954 Hygeia has added a number of new products. The following shows the date of the addition and description of the new products: 641 Date
New Product
May 1955
Pre-mix for automatic dispensers
August 1958
10 oz. (King size) Coca-Cola
July 1960
Fanta (Grape and Orange) in 7 oz. and 10 oz. sizes
October 1961
Sprite, 7 oz. and 10 oz.
May 1963
All products in cans
June 1963
Post-mix and syrup
July 1963
Tab
May 1966
Fresca
May 1966
One-way bottles - 10 oz.
Hygeia anticipates in the reasonably near future adding to its line all products in 16 ounce and 32 ounce bottles and twist-top *192 caps for bottles. Pre-mix is the term used for the process of handling bulk Coca-Cola and related products by placing syrup and carbonated water in stainless steel containers under pressure and delivering those containers to outlets where the mixture is forced out of the containers through a valve to the awaiting paper cups. This type of mix is found in coin operated machines. The addition of Pre-mix to Hygeia's product line required that it acquire Pre-mix type equipment. Although Coca-Cola and related products purchased in cans became a part of the line of products sold by Hygeia in May of 1963, it did not then and does not now manufacture the canned products. It purchases such canned products from a Coca-Cola bottling company in New Orleans, Louisiana. Post-mix is a process whereby the Coca-Cola syrup, or related beverage syrup, is contained in either a one-gallon jug or a five-gallon stainless steel container. It is sold wholesale to the retail outlet in that container. At the outlet there are carbonators, water-cooling equipment and the necessary apparatus to mix the syrup with the water immediately prior to its delivery through the dispensing machine to the customer. The primary *193 difference between the Pre-mix and Post-mix is that in the former the syrup is mixed with the water in the container at the plant, whereas in the latter syrup and water are stored in separate containers and mixed immediately prior to consumption. The beverage bottling industry in which Hygeia is engaged is highly competitive. It is also a seasonal business with its high point in production and sales being reached in June, July and August and its low point in the winter months. Beginning in the mid1950's Hygeia was faced with increased competition from bottlers of competing products such as R.C. Cola, Pepsi-Cola, and Seven-Up. The Seven-Up Company prior to the years here in issue had acquired franchises to bottle Dr. Pepper and Canada Dry. Also beginning in about the mid 1950's Hygeia experienced an increase in competition from "private brands" of soft drinks marketed through chain food stores. Prior to the years here in issue Hygeia's sales had been to a large extent on a cash basis. In the years here in issue a much greater proportion of Hygeia's sales were made to large supermarkets and similar type businesses than had been made to such concerns in earlier years. These concerns were *194 billed by Hygeia every 30 days and Hygeia would receive payment during the following 30 days with the result that a period of approximately 6 weeks on the average transpired between delivery of products by Hygeia to its charge customers and receipt of payment for those products. During the years here in issue the period of time from Hygeia's purchase of its syrup from the Coke Company until it delivered its productt to its customers was on the average from 3 to 4 weeks. During the years here in issue, this period was longer than it had been in previous years because of the variety of products manufactured. With the additions of each new product Hygeia's need for additional working space at its Pensacola plant increased. Hygeia at no time during the years here in issue had any plans to expand its DeFuniak Springs plant which had been built in 1941. Larger washing machines had to be installed for the 10 ounce size bottle than those previously used by Hygeia. Pre-mix requires space for washing and sterilizing equipment in addition to the space used for washing of bottles. In connection with the manufacture of Premix extra space for storage of the full and empty tanks for Coca-Cola syrup *195 is required. The use of larger bottles brought the need for more storage space for bottles than was required when only 6 1/2 ounce bottles were used. Forty-two cases of 6 1/2 ounce bottles are stacked in rows of three on a platform called a pallet. To transport the cases a forklift truck runs its lifts under the platform or pallet and loads the delivery truck with forty-two cases at a time. Because of the difference in height, Hygeia can store only thirty-six cases of 10-ounce bottles on a pallet with a loss of about 14 percent in storage space as compared to storage of 6 1/2 ounce bottles. Introduction of the manufacture of diverse products caused Hygeia to need more parking space and larger trucks. The inefficiency in handling multiple products as compared to a single product required Hygeia to use the larger trucks. Many times a route 642 salesman would take out an excess quantity of a particular product such as grape, orange, or Tab and would haul the extra quantity out and back, when the space was needed for other products. Hygeia must maintain grounds sufficient for a parking area for its trucks. Trucks cannot be detained in the street because they block traffic. Insufficient *196 ground area at Hygeia's plant causes problems when two or three trucks come into the plant at the same time. Hygeia's trucks are loaded for delivery behind its plant, between the west garage and the end of the plant at three loading areas. When the truck is loaded, it must be moved from the loading area into a suitable parking area, and limited space increases the time required for loading. During the years here in issue all trucks were kept overnight or whenever not in use in an open parking area across the street from its plant causing more rapid deterioration of their paint than would occur if they were under cover. For several years prior to and during the taxable years 1962, 1963, and 1964, Hygeia's operations were less efficient than they would have been had it had more available space at its plant. Because of its limited facilities and crowded working conditions at its main plant location Hygeia moved part of its operations to another location during 1964. Prior to 1964 it had expanded its operations into areas previously used as garages for storage of its trucks. Hygeia prior to the years here in issue had converted two of the garages into restrooms which were required for *197 use of its employees. Hygeia had placed the watertreating equipment plant in another garage and still another garage had been converted into a passageway to a plant addition which it had built in 1953. The main plant on North Palafox Street, Pensacola, Florida, was built in October 1936. In July 1964 Hygeia rented a warehouse for $300 per month on East Wright Street about one mile from its main plant to house its cooler department and to use for cooler storage and its radio headquarters. In March 1967 it rented for $300 a month a one-story office building one block north of its main plant to which its data processing department was moved. In May 1967 it moved its advertising department to a warehouse one mile north of its main plant on Palafox Street which it rented for $150 per month. As conditions at Hygeia's main plant began to become crowded with the advent of its manufacture of new products, Hygeia began considering the possibility of remodeling its existing plant. In 1956 in pursuit of this plan, Hygeia engaged the Standardization Committee of Bottlers of Coca-Cola (hereinafter referred to as Standard) to advise it as to a plan for expanding its existing plant. By letter dated *198 June 29, 1956, Harry Robinson (hereinafter referred to as Robinson) Hygeia's plant manager at Pensacola, requested John Shaw (hereinafter referred to as Shaw) of Standard to come to Pensacola for a conference pertaining to an enlargement of Hygeia's facilities. Standard is engaged in furnishing technical advice to CocaCola bottlers who are planning to build or expand their facilities. It is a repository of valuable information for Coca-Cola bottlers obtained from its own research and from various bottlers throughout the United States. It can readily pass on information from one bottler to other bottlers. One of its functions is the making of recommendations regarding building or remodeling plants of Coca-Cola Bottlers. Although it makes a charge to bottlers using its services, the charge is modest compared to the services offered because it operates at no profit. It bills a bottler for its services when the remodeling of a plant or construction of a plant is completed usually at the rate of three-fourths of 1 percent of the contract cost of the building. The services offered by Standard to bottlers in connection with modernizing a plant or building a new one are the following: (1) *199 furnishing preliminary specification books for the assembly of requirements in the plants; (2) preparation of as many initial plans as requested until the building is designed exactly to the bottler's requirements; (3) preparation of a final 1/8 inch scale preliminary plan showing all essential services; (4) preparation of perspectives showing how the building will appear; (5) preparation of any service machinery installation plans that may be required; (6) preparation of outline specifications; (7) securing preliminary approximate estimates of costs as necessary; 643 (8) examination and checking of architect's intermediate and final contract drawings and specifications and submitting observations to the bottler. The services rendered to bottlers by Standard usually result in the bottlers obtaining a reduction in the fee usually charged by his independent architect. Sometimes the preliminary plans are changed several times prior to more detailed plans being prepared even though the more detailed plans are not the construction or final detail plans. Occasionally, Standard draws several sets of preliminary plans for a bottling company that decides to abandon the building of the plant *200 and in those cases when it becomes obvious that the bottler is not going to go through with building the plant, Standard makes a nominal charge to the bottler for the time which has been used in connection with the proposed building program of that bottler. As of the date of trial of this case Standard had not issued a statement to Hygeia for services rendered. The only charges Standard had made to Hygeia were for travel expenses. About one half of Standard's operation costs are borne by Coke Company. Part of the remainder comes from the fees received from bottlers for services that Standards renders and the balance from other companies or associations. Shaw, who is now the Secretary-Treasurer of Standard, was employed by Standard in 1956 and his capacity as such an employee worked with and advised Hygeia on its plans to remodel its plant. Shaw is not a registered architect in America but he is a registered British architect. On July 19, 1956, Shaw's assistant went to Pensacola to discuss the needs of hygeia with its officers. A drawing entitled "Preliminary Bottling Plant Design for Hygeia Coca-Cola Bottling Company - Proposed additions and Authorizations," was prepared by Standard *201 on or about August 10, 1956. The drawing reflects a proposed remodeling of the existing Pensacola plant. In a letter of that same date to Robinson, Shaw stated: It seems to us that further thought should be given to the cost of remodeling, plus the value of the present building and land against the cost of building a completely new bottling plant building. On August 21, 1956, Robinson wrote to Shaw requesting the name of plants that he could visit which had a specific type of truck loading and garaging system, a recommended syrup and crown handling system, and a volume operation in Pre-mix. Shaw gave Robinson a list of names of plants in a letter dated August 23, 1956. On September 6, 1956, Shaw in response to Robinson's telephone request sent the initial plans for the new Raleigh, North Carolina, plant as well as a drawing of the proposed new Tampa plant. Richard Morey Hart (hereinafter referred to as Morey Hart) of Hart Realty Company, Inc., in January 1957 appraised Hygeia's plant at the request of Crawford. Morey Hart valued the property at approximately $300,000 excluding some residential buildings at the back of the lots. Hygeia wrote Standard two letters during 1957, one dated *202 February 22, 1957, regarding a billing for travel expenses and the other dated May 8, 1957, regarding a request for a crown conveyer drawing. On April 11, 1958, Hygeia through Hart Realty purchased a 15 acre tract of land known as the Fairfield property for a total price of $57,350. The amount of $15,500 of the purchase price was paid in cash and the balance was to be paid over a period of 5 years with annual payments of $7,300. At the time the land was purchased it was outside the city limits of Pensacola but it was at that time general knowledge that it was contemplated that the area in which this property was located would be incorporated into the city limits in the reasonably near future. In a letter to Shaw dated May 1, 1958, Robinson stated: We have just recently purchased a tract of land of approximately fifteen (15) acres, and would like to be thinking about preliminary costs and layouts. Before getting down to serious business with you and your colleagues, we are wondering if a topographical survey should not be made? If so, what scale and what intervals would you prefer to have? Also, do you think that we should have soil tests made for foundation footings? In connection *203 with this request, it will be appreciated if you will send me a list of the plants which your department has designed in the last year or so. In traveling around the country, it is possible that Crawford Rainwater might have an opportunity to visit some of these plants. 644 We do not contemplate building in the near future, but want to be prepared in the event that a buyer for our present building looms up on the horizon. By letter of May 5, 1958, from Shaw to Robinson, the former set forth certain information which had been requested concerning the proposed new bottling plant at Pensacola. In a letter dated May 14, 1958, Robinson informed Shaw that a local firm had been commissioned to make a survey of the property and that Crawford and he planned to visit plants in Birmingham, Florence, Decatur, and Memphis. Just prior to the purchase of the Fairfield property Hygeia had abandoned plans to remodel its present plant because of being unable to acquire additional needed land. In January 1958, the wholesale price of bottled Coca-Cola was raised from 85 cents per case to $1 per case. As a result, the total case sales of Coca-Cola by Hygeia dropped from 2,736,611 in 1957 to 2,647,714 in *204 1958. The following chart shows the total case sales for Hygeia as well as the distribution of such sales between its Pensacola and DeFuniak Springs plants for the years indicated: Year
Total Salesby Case
Sales at DeFuniakSprings
Sales atPensacola
n[1]1 1941
872,833
1942
1,128,914
301,248
827,666
1943
1,564,270
410,559
1,153,711
1944
1,516,279 388,973
1,127,306
1945
1,183,960
359,806
824,154
1946
1,143,736
358,025
785,711
1947
1,423,220
460,753
962,467 1948
1,585,916
488,192
1,097,724
1949
1,493,542
459,453
1,034,089
1950
1,442,058
475,939
966,119
1951
1,684,5 50
580,280
1,104,270
1952
1,779,119
594,956
1,184,163
1953
1,866,460
596,673
1,269,787
1954
1,805,504
584,868 1,220,636
1955
1,964,503
627,864
1,336,639
1956
2,198,575
682,287
1,516,288
1957
2,347,855
736,611
1,611,244
1 958
2,010,468
647,714
1,362,754
1959
2,076,247
672,115
1,404,132
1960
1,771,284
568,241
1,203,043
1961
1,748,4 48
542,828
1,205,620
1962
1,923,377
618,224
1,305,153
1963
2,058,729
674,573
1,384,156
1964
2,193,463
731,765 1,461,698
1965
2,258,462
753,568
1,504,894
1966
2,491,574
836,259
1,655,315
1967
2,700,918
960,115
1,740,803
On October 1, 1959, the Fairfield property was rented for a golf driving range at an annual rental of $1,200 until the gross operation of the driving *205 range exceeded $18,000 and 10 percent of profits in excess of $18,000 per year. The lease was for 3 years with Hygeia having a right to cancel it on 90 days notice to the lessee. After purchasing the Fairfield land, Hygeia's officers had numerous informal discussions with respect to the type of new plant which would best serve Hygeia's needs and during the following year and continuing into 1960 they inspected other plants to obtain ideas as to current trends in plant building. At the Stockholders' Annual Meeting on February 16, 1961, it was decided not to exercise Hygeia's right to purchase land adjoining the Fairfield property under Hygeia's agreement with the owner giving Hygeia 30 days within which to purchase property otherwise to be sold to another. 645 Sometime in 1962 one of respondent's agents began an audit of Hygeia's Federal income tax liabilities for the years 1959, 1960 and 1961. The agent was advised by an officer of Hygeia to consult with the certified public accountant who has been acquainted with the accounting and financial affairs of Hygeia since 1946. A meeting between respondent's agent and Hygeia's accountant was held on January 16, 1963. The issue involving *206 the possibility of a tax on the accumulated earnings of Hygeia was raised at that time. On May 16, 1963, an informal conference was held with respect to the agent's audit of Hygeia's Federal income tax liability for the years 1959, 1960, and 1961. At that conference, Crawford, the certified public accountant with whom respondent's agent had previously spoken and A.S. Moffett, Hygeia's treasurer were present. On February 8, 1963, Crawford visited a Coca-Cola bottling plant in Tampa, Florida, and in April he visited plants in Gulfport and Ocean Spring, Mississippi. In a letter to Shaw dated May 20, 1963, Robinson stated in part: About five years ago we had some correspondence about remodeling our present plant in an effort to incorporate drive-in loading and parking. At the same time you sent us preliminary drawings on the new plants at Raleigh, North Carolina and Tampa, Florida. Since that time we have purchased a 15-acre tract of land North-east of our present location and Crawford Rainwater would like to institute long-range planning towards eventually building a new plant. At one time you requested a [the] plant to fill out a data booklet which included budgeted volume for ten to *207 fifteen years, the number of vehicles in operation, etc. If this is still customary we shall be glad to develop this data along with the Market Research Department. Then, too, you will very likely want to come to Pensacola to see the property and discuss this with us. The data booklet referred to in the letter is basically the same book as a preliminary design data book or as a preliminary specifications for architectural planning. A preliminary design data book was the means of setting forth the projection of needs of the business for a future period of time, such as 20 years. By letter to Robinson dated June 5, 1963, Shaw sent the preliminary data book and in a letter dated June 13, 1963, to Robinson explained the services offered by Standard to the bottlers. On November 20, 1963, Crawford visited two plants located in Dallas, Texas, and in May 1964, visited plants located in Worcester and Braintree, Massachusetts, Providence, Rhode Island, and Alexandria, Virginia. While preparing his file with respect to the audit by the Internal Revenue Service of Hygeia for the taxable years of 1959, 1960, and 1961, Hygeia's attorney on June 19, 1963, requested from Shaw the status of the plan *208 for building and an estimate of the building cost. By letter dated July 13, 1964, Crawford sent Shaw two volumes of preliminary specifications for architectural planning, an aerial map showing location of the Fairfield property in relation to surrounding subdivisions, a survey of special space requirements for the general office, three photographs of the Fairfield property, and a topographical survey of that property showing the location of utilities and other facilities. On July 15, 28, and 29, 1964, Crawford visited plants at Shreveport, Louisiana, and Raleigh and Durham, North Carolina. By letter dated August 13, 1964, Shaw sent to Crawford three copies of a preliminary drawing numbered 2195. One of the copies was sent so that it could be made available to Hygeia's attorney to help him support his discussions with representatives of the Internal Revenue Service. Specific questions of Crawford's in regard to plans for the new plant were also answered in the letter. In a letter dated August 14, 1964, to Shaw, Crawford acknowledged receipt of the preliminary drawings and requested a meeting with Shaw in Atlanta about September 18, 1964. By letter dated September 2, 1964, to Shaw, *209 Crawford confirmed the dates of Friday September 18 and the following Monday for a conference to go over in detail the preliminary drawings of the proposed new plant. On September 18, 1964, officials of Hygeia, including Ned Perkins and Robinson met with representatives of Standard to go over the drawing #2195. On October 5, 1964, Crawford wrote Shaw confirming a planned visit by Shaw to the Pensacola plant for Thursday, October 22. Shaw visited the Pensacola plant on that date. A bill was sent to Hygeia for his traveling expenses on October 28. 646 By letter dated December 3, 1964, John Morris on behalf of Shaw sent to Crawford the preliminary plan #2195B dated November 30, 1964 pointing out various revisions resulting from the October meeting between representatives of Hygeia and Shaw. A letter to Brown Rainwater from Bert Wells of the Coke Company dated December 11, 1964, contains the statements "During the ABCB convention in Chicago, you told me of your intention to include storage facilities for liquid sugar in your new plant." Shaw by letter dated December 31, 1964, to Crawford acknowledged receipt from Crawford of an article on E.D.P. (computer room) facilities and commented *210 on a suggested machinery layout by Brown Rainwater for the new plant. During the month of January 1964, Crawford visited plants in San Diego, California and Phoenix, Arizona. On February 23, 1965, Hygeia listed the Pensacola plant property located on North Palafox Street for sale with the Hart Realty Company. A brochure for the property was published in March 1965. As of the time of trial no acceptable bids for the property had been received. By letter to Crawford dated March 26, 1965, Shaw pointed out the advantages and disadvantages as well as the cost involved of several different ceiling coverings which had been discussed the previous day at a meeting between the two. Along with the consideration of ceiling coverings, J. M. Cherry of the Coke Company on the request of Shaw sent to Crawford the I.A.C. report C-142 Noise Survey. Shaw received from Frank W. Melcher a letter dated June 11, 1965, concerning the alkalinity of the Pensacola water supply in relation to the processing done by a bottling company. Shaw and Crawford exchanged letters dated September 13, 1965, and October 4, 1965, concerning the use of Pittsburgh-Corning's geocorystical material in the bottling and syrup rooms. *211 On November 10, 1965, Crawford visited a plant located at Miami, Florida, and later on December 15, 1965, he visited another plant located in San Antonio, Texas. During 1965, Crawford spent considerable time on his own and worked eight months with research men in determining what the bottling industry would be in 1970. The report was published by The Corplan Associates, affiliate of the Illinois Institute of Technology, in February 1966, and was entitled "A Study of the Soft Drink Industry, 1965-1970." In the section entitled "Afterward" the following was written: The soft drink industry stands on the threshold of massive change. Although one can reasonably question the exactness of timing and magnitude of many of the statistics and projections drawn in this study, no one can deny that the industry will changed dramatically in the next decade. This change should be looked upon as a challenge, and an opportunity, for the industry to not only maintain, but to increase, total activity and total profits. The state of the soft drink industry development was considered by Crawford in determining when, where and how to build a new plant for Hygeia. In the study in which Crawford participated *212 a projection was made that by 1970, 30 percent of business would be in packages that did not exist three or four years prior to 1968. It was further projected that by 1980, 90 percent of the business would be in entirely different packages than those used in 1968. The study envisioned at some future time a truck would drive up, unload plastic out of a tank and a container would be manufactured and filled in a bottler's own plant. Hygeia did not want to invest in a new plant with a probability the plant would become obsolete within 5 years or so after it was erected. Therefore, the anticipated needs of the foreseeable future was a consideration in developing plans for the new plant. Early in 1966, Daniel Hart was authorized to make preliminary drawings for Hygeia's new plant. Standard was notified of the retention of Hart in a letter to Shaw dated February 22, 1966, in which Crawford said that Hart would be contacting Shaw and asked Shaw to assist Hart on the plans. Hart had previously done architectural work for Hygeia at the North Palafox location, in connection with plant additions, air conditioning, roof repair, remodeling of service area, syrup room, and offices and machine placement. *213 Hart's first drawings for the new plant were dated April 15, 1966. At the time of the trial Hygeia had made payments to Hart on four different dates totalling $15,362.50 for his work on preliminary plans and specifications for a new plant for the Fairfield property. 647 During the month of February 1966, Crawford visited plants located in Miami and Tampa, Florida. Later that year in July he visited plants in Philadelphia, Pennsylvania, and Baltimore, Maryland. By letter dated October 21, 1966, Crawford requested Shaw to review the drawings made by Hart and to go over the plans with Hart when Hart was in Atlanta on the next Monday and Tuesday. Shaw reported to Crawford by letter dated November 3, 1966, on his study of the drawings made by Hart, calling attention to eleven points for further thought and reconsideration. During 1966 Hygeia sought to purchase property adjoining the Fairfield Drive property. In the contract of purchase of the Fairfield property Hygeia was given the right of first refusal of certain nearby property. It was given the opportunity to exercise this right to purchase a two-acre tract for $156,000 and later a one-half acre tract for $32,500. Both offers were *214 refused by Hygeia as being excessive in price. Hygeia also had an opportunity to negotiate for property of 3 1/2 to 4 acres belonging to the L & N Railroad Company. However, this acreage was in the form of a triangle and was considered to be impracticable for Hygeia's purpose. Sometime late in 1966 or early in 1967, Hygeia abandoned its plans to build on the Fairfield property primarily because of problems of getting trucks in and out of the plant area and the land not being large enough to allow for expansion of the plant at a later date. When Hygeia purchased the Fairfield property, it was located on an undeveloped twolane road called Maura Drive. Later that road was made into a four-lane highway as a part of the extension of Fairfield Drive. The property has access on the west to the Ferry Pass Highway which like Fairfield Drive was a heavily-traveled artery. The increase in traffic on the extension of Fairfield Drive made that road unsuitable for use by trucks leaving and entering a yard both because of the time required and the hazard caused by large trucks attempting to cross the road in the traffic. Contributing to the increase in traffic on the Fairfield Drive entrance was *215 a shopping center built in the early 1960's directly across Fairfield Drive from Hygeia's property. Daniel Hart observed the traffic conditions in and out of the shopping center and found that one of the two main entrances to the shopping center is on to Fairfield Drive with substantial traffic being generated and at times congested traffic. Interstate Highway 10 now under construction will pass close to the Fairfield Drive property adding to the traffic problems. On July 6, 1967, Hygeia through a trustee, obtained exclusive right to purchase within 90 days for a price of $60,000 between 54 and 60 acres of land in an area suitable for a plant for a bottling company. The option was extended and exercised and on February 7, 1968, Hygeia purchased the property paying $15,000 in cash and giving a purchase money mortgage for the balance payable at $500 a month with interest at 6 percent per annum on the unpaid balance. In addition to the $15,000 cash, Hygeia paid $6,000 to Hart Realty Company, Inc., as a commission for locating the property. The Fairfield property purchased by Hygeia in 1958 for $57,350 was listed for sale with Morey Hart on August 18, 1967, at a price of $180,000. At the *216 time of trial of this case the new plant had not been built nor had a construction contract been let. As of the date of the trial of this case Shaw estimated that the cost of the new plant consisting of approximately 130,000 square feet would be between $1,300,000 and $1,430,000 and machinery for the plant would cost approximately $500,000. As of August 1964, Shaw had estimated that a 96,000 square-foot plant for Hygeia would cost approximately $960,000 without the necessary machinery. In 1950, Hygeia began loaning money to its then Secretary-Treasurer Crawford. Those loans were reflected by demand notes signed by Crawford. In 1956 Hygeia began loaning money to other officers but in lesser amounts than the amounts loaned to Crawford. The following is an itemization of the balances of notes receivable due to Hygeia from other officers of Hygeia, Brown Rainwater and Crawford and from Paris Coca-Cola Bottling Company as of December 31 of each of the listed years: 648 Year
BrownRainwater
W. H. Ran- dolph, III
A. S.Moffett
Paris Coca-ColaBottling
Company
Crawford Rainwater
Totals
1950
$ 36,000
$ 36,000
1951
63,000
63,000
1952
165,000
165,000
1953
166,000
166,000
1954
216,000
216,000
1955
209,000
209,000
1956
$ 3,000
235,500
238,500
1957
3,000
275,500
278,500
1958
$ 5,000
3,700
344,000
352,700
1959
5,000
4,900
376,500
386,400
1960
5,000
6,100
$57,500
467,000
530,600
1961
5,000
8,200
37,500
537,000
587,700
1962
7,500
13,950
$ 975
32,500
563,000
617,925
1963
21,950
12,650
425
6,000
599,000
640,025
1964
21,950
12,300
582,000
616,250
1965
576,000
576,000
1966
520,000
520,000
1967
508,000
508,000
Out *217 of the 5,000 total outstanding shares of Paris Coca-Cola Bottling Company, 4,004 shares were owned by Crawford, close relatives of Crawford, and by Dugene C. Smith as of January 13, 1965, as follows: Shareholder
Relationship to Crawford
Shares owned
Crawford Rainwater
400
Betty Rainwater
Wife
200
Charles V. Rainwater
Father
1,711
Eugene Smith
No relation
800
Elizabeth A. Rainwater
Daughter
200
Elizabeth B. Rainwater
Niece
93
Brown Rainwater
Brother 600
Total
4,004 The stock ownership of Paris was the same, or approximately the same, during the years 1960, 1961, 1962, 1963, and 1964, as it was on January 13, 1965. The demand notes bore interest rates ranging from 4 percent in 1956 to 6 1/2 percent in 1966 which rates were at least equal to and usually higher than the interest which was being paid by Hygeia on loans to it. All annual interest on the loans was in fact paid by Crawford. During the taxable years 1962, 1963, and 1964, Crawford paid approximately $105,000 in interest to Hygeia, which was included by Hygeia in its taxable income. Crawford's notes to Hygeia were secured by a $200,000 accident insurance policy and $150,000 in notes from the Perdido Ranch signed by Brown Rainwater, Crawford's brother. *218 Perdido Ranch consists of 7,600 acres of timberland owned in partnership by Crawford an Brown Rainwater. The timberland is under a 60-year timber-cutting contract with St. Regis Paper Company. In addition to the security of this collateral, Crawford's notes to Hygeia were further secured in March 1965 by the endorsement by Charles V. Rainwater, whose net worth is approximately 3 million dollars. Crawford could have paid the notes at any time during the years here pertinent had demand for such payment been made. Hygeia's loans to its officers were approved by its Board of Directors at each annual meeting. The money borrowed by Crawford was used to develop Perdido Ranch, to purchase, develop and operate property known as the "Raynagua Farm" and to assist one of his brothers. The following repayments were made by Crawford on his indebtedness to Hygeia in the years indicated: 1963
1964
1965
1966
1967
$25,000
$28,000
$6,000
$56,000
$12,000 During the years 1950 to 1968, inclusive, Hygeia's loans to Crawford earned $348,696.16 in interest which amount was paid to Hygeia by Crawford. Since its incorporation, Hygeia has had a consistent dividend policy. It has been the policy to pay dividends on a *219 monthly basis. This policy was carried out during the years 1962, 1963, and 1964. The following shows the annual amounts of dividend payments by Hygeia from 1926 through 1964: 649 1926
$ 13,000 1939
$ 38,000 1952
$60,000 1927
10,000 1940
36,000 1953
60,000 1928
40,000 1941
36,000 1954
80,000 1929
36,000 1942
27,000 1955
60,000 1930
42,000 1943
36,000 1956
60,000 1931
42,000 1944
36,000 1957
60,000 1932
42,000 1945
36,000 1958
60,000 1933
42,000 1946
66,000 1959
60,000 1934
48,000 1947
36,000 1960
80,000 1935
48,000 1948
36,000 1961
80,000 1936
113,000 1949
36,000 1962
80,000 1937
60,000 1950
80,000 1963
60,000 1938
50,000 1951
80,000 1964
80,000 Hygeia regularly pays its monthly dividends on the 20th of the month. Dividends for a forthcoming year are authorized by the Board of Directors to be paid to the extent that the cash, undivided profits account, and the financial condition of the company warrant with the determination of the amount of the monthly payments left up to the officers. Crawford, first as the Secretary-Treasurer and later as the President, made the monthly determination of amounts of dividends to be paid during the years 1954 through 1967. The Board of Directors at its annual meeting approved the dividends *220 as paid by the officers for the past year. During the taxable years 1962, 1963 and 1964, dividends of $5,000 were paid in each of the months of January through November. For the years 1962 and 1964 dividends of $25,000 were paid in December and for the year 1963 a dividend of $5,000 was paid in December. [13]
The following schedule shows Hygeia's total earned surplus, the increase in earned surplus, net income after taxes and the percentage of net profit distributed as dividends for the years 1954 through 1964: Year
Total EarnedSurplus
Increase inEarned Surplus
Net IncomeAfter Taxes
Percentage ofNet ProfitDistributed
1954
$942,325.95
$24,884 .49
$ 104,884.49
76%
1955
944,975.41
52,649.46
112,649.46
54%
1956
1,057,142.10
62,166.69 122,166.69
49%
1957
1,074,722.58
17,630.48
77,630.48
77%
1958
1,106,314.84
31,542.26
91,542.26
66%
1959
1,142 ,018.91
35,704.07
95,704.07
63%
1960
1,243,051.41
101,032.50
181,032.50
44%
1961
1,315,070.94
72,019.53
152,01 9.53
59%
1962
1,387,599.72
72,528.78
162,122.59
49%
1963
1,454,071.99
66,472.27
143,748.77
42%
1964
1,615,669.75
161,159.76
214,746.27
37%
The *221 following shows the tax effect which would have resul The following shows the tax effect which would have resulted from Hygeia distributing the Adjusted Accumulated Taxable Income as computed in the statutory notice of deficiency as dividends to its shareholders and the beneficiaries of the Trust of Blanche Edmondson Rainwater in the years here in issue if their income as reported on their tax returns had otherwise remained unchanged. 650 1962
1963
1964
Shareholder
Increase in Dividend Income
Increase in Taxes
Increase in Dividend Income
Increase inTaxes
Increase in Dividend Income
Increase in Taxes
Mrs. Sallie E. Duff
$15,995.25
$10,031.79
$16,327.79
$9,810.98
$23,730.75
$14,143.52
Martha Brown Edmondson
19,105.44
10,787.40
19,502.64
10,144.19
28,345.06
16,153.84
Mrs. Lucia E. Perkins
15,995.25
10,963.68
16,327.79
10,845.76
23,730.75
14,889.85
Charles V. Rainwater
15,568.72
12,603.60
15,166.71
11,946.17
22,043.22
16,422.20
Brown Rainwater
5,562.79
2,542.52
5,315.61
2,375.06
7,725.68
3,547.78
Crawford Rainwater [1] *222 5,562.79
0
5,315.60
0
7,725.68
0
Veazey Rainwater, Jr. 5,562.79
Not shown
5,315.61
Not shown
7,725.68
0
Totals
$83,353.03
$46,928.99
$83,271.75
$45,122.16
$121,026.82
$65,157.19
The average operating cycle of Hygeia during the years 1962, 1963, and 1964 was somewhere between six and seven weeks. The period was somewhat shorter on the average for cash sales and somewhat longer for charge sales. Also in the spring when it was necessary to accumulate inventory looking toward the peak sales period of the summer months of June, July and August, the operating cycle would be longer. The term "operating cycle" includes the period of time from the purchase by Hygeia of the raw product (syrup) until the end product (bottled drinks) is delivered and paid for. This includes the period of time in which accounts receivable and inventory turn over in the normal course of business. Vending equipment and coolers were purchased for resale and for leasing by Hygeia. Some of such purchases were for cash and others on an installment basis spread over 36 months. Hygeia sold coolers to dealers on deferred payment plans usually payments to be made over a 5-year period. During the years 1962, 1963, and 1964, Hygeia had gross additions to fixed assets of $343,108.00, $567,919.24, and $399,939.75, respectively. During *223 the years 1962, 1963, and 1964, Hygeia's total deductions for depreciation and investment credit were $362,861.63, $378,603.94 and $452,110.10, respectively. It executed notes for coolers in those years in the respective amounts of $253,413.82, $279,297.72 and $127,595.10 and other notes of $22,500, $235,000 and $70,000, respectively. It made cash payments on fixed assets in the years 1962, 1963 and 1964 in the respective amounts of $67,196.18, $53,621.52 and $202,344.65. The following is a compilation of all the payments made on Hygeia's notes and mortgages during the years 1962, 1963, and 1964: 1962
Paid Within1963
1964
Vending Equipment and Cooler Notes
$138,197.26
$177,263.65
$225,183.42
Other Notes
100,000.00
216,500.00
195,000.00
Mortgages Payable 29,854.50
31,186.15
25,296.40
Total Payments on Notes and Mortgages
$268,051.76
$424,949.80
$445,479.82
The following is a detailed balance sheet of Hygeia as of December 31, 1962, 1963 and 1964: CURRENT ASSETS
12-31-62
12-31-63
12-31-64
Cash
$26,461.12
$13,346.93
$27,872.78
Accounts Receivable - Trade
45,769.60
70,176.60
85,743.96
Cooler Receivables [1] *224 239,354.87
291,163.25
303,200.29
Inventories - Coolers
74,732.09
78,644.25
60,963.97
Inventories - Other
67,446.57
81,630.02
76,744.14
Miscellaneous (Other) Investments
2,000.00
Deferred (Prepaid) Expenses
28,388.88
37,800.77
27,623.74
Sundry Receivables
5,563.98
6,785.88
5,272.85
Returnable Containers
132.00
88.00
123.00
Employees Receivable
11,980.85
551.53
1,798.64
Notes Receivable - From Officers and Directors other than Crawford
22,425.00
35,025.00
34,250.00
Notes Receivable - Paris Coca-Cola Bottling Company
32,500.00
6,000.00
Notes Receivable - Crawford Rainwater
563,000.00
599,000.00
582,000.00
Notes Receivable - Other 8,702.76
4,937.76
3,542.76
Total Current Assets
$1,128,457.72
$1,225,149.99
$1,209,136.13
FIXED ASSETS (Net)
Land
$90,935.84
$90,935.84
$91,780.11
Buildings
310,079.84
309,999.33
289,643.40
Machinery & Equipment
245,474.08
224,720.92
226,347.43
Furniture & Fixtures
15,354.17
15,366.68
27,483.88
Delivery Equipment
85,657.39
137,481.33
154,493.42
Coin Coolers
192,926.35
252,044.11
202,515.16
Bottles
136,656.27
158,539.38
168,917.09
Cases
11,065.60
34,754.90
40,507.98
Pre-Mix Tanks
22,926.84
70,462.43
61,782.12
Pre-Mix Vending
35,265.26
Industrial Vending Equipment
1,374.84
11,738.24
12,312.88
Post-Mix Vending 5,837.93
32,085.12
38,286.16
Total Fixed Assets
$1,153,554.41
$1,338,128.28
$1,314,069.63
Territory and Franchise 105,250.00
105,250.00
105,250.00
TOTAL ASSETS
$2,387,262.13
$2,668,528.27
$2,628,455.76
CURRENT LIABILITIES
Accounts Payable
$7,537.93
$30,842.72
$3,064.21
Employee Deductions Payable
29,834.56
29,197.68
34,714.91
Accounts Payable Miscellaneous
10,898.46
2,984.66
30,223.31
Notes Payable [2]
238,197.26
393,763.65
420,183.42
Mortgages Payable [2]
29,854.50
31,186.15
25,296.40
Other Accruals
2,010.11
6,633.41
9,612.82
Federal and State Income Tax Payables 119,440.77
86,509.31
124,766.92
Total Current Liabilities
$437,773.59
$581,117.58
$647,861.99
OTHER LIABILITITS (Not due in current year)
Deposit on Containers
$3,453.73
$3,453.73
$3,453.73
Mortgages Payable
296,425.62
265,239.47
239,943.07
Notes Payable [3] 162,009.47
264,645.50
21,527.22
Total Other Liabilities $461,888.82
$533,338.70
$264,924.02
Total Liabilities
$899,662.41
$1,114,456.28
$912,786.01
NET WORTH
Capital Stock
$100,000.00
$100,000.00
$100,000.00
Earned Surplus 1,387,599.72
1,454,071.99
1,615,669.75
Total Net Worth
$1,487,599.72
$1,554,071.99
$1,715,669.75
Total Liabilities and Net Worth
$2,387,262.13
$2,668,528.27
$2,628,455.76
The following shows Hygeia's income as reported on its Federal income tax returns but adding to expenses the amount of the Federal income taxes. INCOME STATEMENT
1962
1963
1964
Sales:
$2,418,293.25
$2,604,144.86
$3,162,832.69
Less Cost of Goods Sold [1] *225 726,068.49
825,870.51
876,727.78
Gross Profit 1,692,224.76
1,778,274.35
2,286,104.91
Income from: Interest
36,766.28
39,955.84
37,770.85
Rents
9,840.47
10,002.00
10,088.00
Net gains
901.29
2,728.35
Misc.: Coin Coolers
120,430.09
128,618.73
66,046.44
Cooler Sales
21,924.82
31,607.70
12,412.47
Container Deposits
19,281.34
13,699.89
6,638.51
Others 10,998.94
13,352.88
12,915.93
Total Income: 1,912,367.99
2,015,511.39
2,434,705.46
Expenses: Salaries & Wages
681,729.39
736,069.80
838,003.61
Bad Debts
1,043.05
217.19
524.42
Rents
623.25
615.75
2,756.25
Taxes-other than Federal
73,742.05
82,869.58
86,833.51
Interest
40,429.65
43,296.95
48,753.63
Contributions
2,341.00
2,537.00
3,244.00
Depreciation
353,267.87
361,326.61
438,004.16
Pension Plan
64,504.30
65,160.81
59,257.25
Production
86,627.23
131,484.54
183,616.54
Delivery Equipment
67,727.36
69,461.67
79,643.63
Sales & Advertising
108,950.40
125,047.24
129,479.10
Administration
100,800.64
116,029.57
141,268.27
Cooler Service
24,778.82
29,369.12
37,253.22
Federal Income Taxes 143,680.39
108,276.79
171,321.60
Total Expenses 1,750,245.40
1,871,762.62
2,219,959.19
[2] Net Profit after taxes
$162,122.59
$143,748.77
$214,746.27
The audit statements prepared by Hygeia's certified public accountants showed the same net income as shown on Hygeia's Federal Income tax returns for each of the years here in issue. However, these statements showed a lesser gross profit each year and listed expenses under different categories, the net income being computed as follows: 1962
1963
1964
Sales - Carbonated Beverages
$2,414,863.45
$2,580,254.73
$3,099,974.72
Less - Cost of Manufactured Goods Sold 1,187,405.60
1,328,256.63
1,457,619.30
Gross Profit
$1,227,457.85
$1,251,958.10
$1,642,355.42
Other Income: Coolers
21,924.82
31,607.70
12,412.47
Misc. Merchandise
1,160.06
2,178.95
2,576.62
Interest Earned
36,766.28
39,955.84
37,770.85
Sundry Additions 20,388.46
21,501.44
18,726.10
Total Income $1,307,697.47
$1,347,202.03
$1,713,841.46
Expenses: Sales
365,440.28
410,489.64
470,548.84
Advertising
114,083.21
127,121.75
129,409.73
Administration
270,451.39
291,752.25
310,826.30
Delivery Equipment
126,363.12
138,501.08
175,911.04
Cooler Service 66,354.31
68,295.47
157,709.60
Total Expense $942,692.31
$1,036,160.19
$1,244,405.51
Taxes: Federal Income Tax
143,680.39
108,276.79
171,321.60
State Income Tax
230.38
232.52
505.32
Investment Credit 9,593.81
17,276.50
Total Taxes $153,504.58
$125,785.81
$171,826.92
Prepaid Accounts: Interest Paid
40,429.65
43,296.95
48,753.63
Bonus
17,499.10
15,269.62
33,584.71
Sundry Deductions 1,043.05
217.19
524.42
Total Prepaid Accounts
$58,971.80
$58,783.76
$82,862.76
Total Expenses, Taxes, and Prepaid Accounts
$1,155,168.69
$1,220,729.76
$1,499,095.19
Net Income
$152,528.78
$126,472.27
$214,746.27
*226 Ultimate Findings of Fact The costs of signs, clocks, and scoreboards, including installation costs deducted as business expenses by petitioners, Alabama, Beaumont, and Hygeia, should have been capitalized and amortized over a period of 5 years. During the years 1962, 1963 and 1964 Hygeia did not permit its earnings and profits to accumulate beyond the reasonable needs of its business. Opinion Issue with Respect to Capitalization of Expenditures for Signs, Clocks and Scoreboards The first issue in this case relates to all petitioners and involves the propriety of their deduction as an ordinary and necessary business expense under section 162[14] *227 of the costs of signs, clocks, and scoreboards. Petitioners contend that the amounts paid for these items are deductible as 655 current advertising expenses. Respondent takes the position that since the signs, clocks, and scoreboards purchased by petitioners had a useful life of more than 1 year, the amounts paid for them were of benefit to petitioners in future years and therefore constitute capital expenditures under the provisions of section 263. [15] The evidence shows that the signs, clocks, and scoreboards had a useful life as physical properties of at least 5 years. Petitioners, though not directly conceding this fact, do not specifically contend that the signs, clocks, and scoreboards would wear out or become obsolete in less than 5 years. It is petitioners' position that these items, which we will refer to collectively as signs, were not assets of petitioners. The signs were placed on properties of petitioners' customers and petitioners contend that whether or not they retained legal ownership of the signs as a matter of practice and good business operations they would never take back signs without the consent of customers upon whose premises the signs had been placed. The record is not clear as to the legal ownership of the signs after they were placed on *228 the business premises of one of petitioners' dealer-customers. Petitioners attempted to remove signs when a customer moved and the new dealer at the location did not intend to carry petitioners' products or wished to use a competitor's sign. If petitioners placed a newer model sign on a customer's premises, they always removed the old sign, repainted it, if necessary, and placed it at the location of another customer. Insofar as this record shows, petitioners never actually had any customerdealer retain any sign. There is some evidence that on rare occasions a clock of the interior-type might have been taken home by a customer-dealer when that customerdealer placed a clock bearing advertising of one of his other suppliers on his business premises. The indication is that such a practice was not prevalent. Respondent does not contend that the signs are physical assets owned by petitioners which should be subject as such to depreciation. Respondent contends that the amounts spent by petitioners for these signs even though considered as spent for advertising resulted in a benefit to petitioners which would extend over a period of 5 years. Therefore, respondent contends the expenditures *229 should be amortized over a 5-year period. Petitioners take the simple position that an expenditure for advertising as distinguished from the acquisition of physical assets cannot be considered capital in nature and amortizable over any period in excess of 1 year. Petitioners argue that the value of the signs for advertising purposes is not necessarily co-extensive with their physical useful life. They argue that the good relationship created with the customer-dealer from placing the sign on his property as well as the sales of coca-cola to the individual who is influenced to try the product because of observing the sign might continue indefinitely. This argument could be interpreted to be that the expenditures here in issue were for a type of goodwill with no determinable useful life. If such were the case these expenditures would be for a capital asset not subject to depreciation or amortization. Respondent does not take such a position in this case and we do not consider such an issue to be involved herein. The signs were placed on the business premises of petitioners' customer-dealers for the purpose of advertising petitioners' products. They were carefully located in a traffic *230 pattern to call attention to the name of Coca-Cola and to call the attention of the public to petitioners' products. As long as a sign remained where it was placed it served to advertise petitioners' products. The record shows that petitioners' products were advertised by each sign over the period of the useful life of that sign. A 5-year useful life for the signs was determined on the basis of the length of time such signs generally remained on the premises where they were originally installed. We therefore have a situation where petitioners purchased signs which they placed before the public for advertising purposes and from which they obtained advertising advantages over the 5-year period that the signs remained where they were placed. This is a typical example of a capital expenditure. Therefore, unless petitioners are correct in their contention that there is no basis in law for capitalizing amounts expended for advertising even though the amount paid is for advertising which will appear before the public for more than 1 year we must sustain respondent's contention. The taxpayer in Peninsular State Bank of Detroit, 3 B.T.A. 399 (1926)656 had purchased a number of small banks *231 or safes which it provided for use of its customers to encourage them to accumulate savings to deposit with the taxpayer. We held that the expenditure made in the taxable year there in issue constituted a capital expenditure and not a deductible business expense. In Liberty Insurance Bank, 14 B.T.A. 1428 (1929), reversed on another issue sub nom, Commissioner v. Liberty Bank & Trust Co., 59 F. 2d 320 (C.A. 6, 1932), we held that amounts expended in purchasing novelty banks to be distributed to the taxpayer's new depositors to encourage savings deposits in the taxpayer's bank constituted a capital expenditure and sustained respondent's determination that the reasonably ascertainable useful life of the advantages obtained by the taxpayer through the expenditure was 4 years. In that case we stated at page 1435 as follows: In several cases we have pointed out that expenditures for advertising and promotion may create or increase the value of an asset in the nature of a trade name or good will. We have pointed out that in such cases it would be proper to capitalize that portion of such expenditures that can properly be said to be directed toward such an object. Northwestern Yeast Co., 5 B.T.A. 232; *232 Richmond Hosiery Mills, 6 B.T.A. 1247; affd. 29 Fed. (2d) 262. The difficulty is a practical one in determining what portion represents a current expense of the business of the year and what portion is properly to be attributed to future years. We are satisfied that in the instant case the usefulness of these banks as an advertisement for the petitioner did not cease with the taxable year. * * * The holding in Liberty Insurance Bank, supra, has continued to be followed by this Court. Petitioners rely in support of their contention primarily on E. H. Sheldon & Co. v. Commissioner, 214 F. 2d 655 (C.A. 6, 1954), reversing in part 19 T.C. 481 (1952). In that case we held that certain expenditures by the taxpayer in preparing and publishing a catalog should be capitalized and amortized over the useful life of the catalog. The Court of Appeals for the Sixth Circuit pointed out that current advertising expense is usually an ordinary and necessary business expense deductible in the year incurred but that certain necessary business expenses may be of a nature to be in fact capital expenditures not deductible in the year incurred but to be recovered by depreciation ratably over the useful life *233 of the asset acquired by the expenditures. The Sixth Circuit in its opinion stated that by its nature advertising expense incurred in one year might create a benefit which would carry over to other years but concluded that this fact should not cause the expenditures not to be deductible as a business expense where, as in the case being considered, the evidence showed no reasonable certainty of benefits resulting in later years from the expenditure. In Best Lock Corporation, 31 T.C. 1217 (1959), we held amounts expended by the taxpayer in 1951 and 1952 in publishing a catalog which was to be used through the year 1956, were capital expenditures which were not properly deductible in the year expended but should be recovered through a depreciation allowance. In the Best Lock Corporation case we stated (at 1234): * * * The petitioner relies on E. H. Sheldon & Co. v. Commissioner, 214 F. 2d 655 (C.A. 6, 1954), reversing, 19 T.C. 481. There the Court of Appeals took the view that payments for preparing a catalog subsequently published were similar to advertising expenses and deductible when paid even though their effect might have a useful life of indefinite duration in the future. A similar *234 result was reached in Harper & McIntyre Co. v. United States, 151 F. Supp. 588 (D. Iowa, 1957). In the present case the catalogs previously published by Best Lock Corporation and its predecessor were issued at irregular intervals and largely made from the same plates. The 1953 catalog was new and was used until 1956, * * * The amounts paid in 1951 and 1952 to produce it were capital items contributing to earning income for several years in the future and not ordinary and necessary expenses of doing business in 1951 and 1952. They are not deductible. If the Sheldon case, supra, is not distinguishable on the facts, we adhere to the view expressed in our decision there, and with all due deference to the Court of Appeals for the Sixth Circuit, prefer to follow that decision here. We hold that respondent was correct in capitalizing the amounts expended by petitioners for the cost of signs, including the installation cost thereof. It is not clear whether petitioners contended that the installation costs of the various signs are not to be considered to be of the same nature as the cost of purchasing the signs. However, if certain arguments of petitioners are to be interpreted as dealing separately *235 with 657 the installation costs of the signs, we sustain respondent's position that the installation costs are in substance additional costs of the signs and are capital expenditures. A similar issue was before this Court in Fall River Gas Appliance Co., Inc., 42 T.C. 850 (1964) aff'd, 349 F. 2d 515 (C.A. 1, 1965). In that case we held that installation expenses of leased gas appliances were capital expenditures and determined the useful life of such installations. In so holding we stated at page 856: We reject the appliance company's contention that since the installations were basically an improvement to the customer's real estate with little or no salvage value to it the cost of installation must be treated as a current expense. It has long been held that the cost of an improvement which results in an economic benefit or advantage to a taxpayer's business extending beyond the taxable year is a capital expenditure even though title to the improvement may be vested in another. Among the cases cited in support of this statement in Fall River Gas Appliance Co. is D. Loveman & Son Export Corp., 34 T.C. 776 (1960) aff'd 296 F. 2d 732 (C.A. 6, 1961), certiorari denied 369 U.S. 860. The *236 D. Loveman & Son case involved a taxpayer's expenditure for paving a road leading into its business establishment. The road had a useful life of 20 years. There was a question whether the property on which the road lay was owned by the taxpayer or by the municipality. We stated that the road constituted property used in the trade or business of the taxpayer even if the title to the road was vested in the municipality since that taxpayer paid the cost of paving the road in order to have a proper road entering his property. We held the cost of paving the road to be a capital expenditure recoverable by depreciation deduction over the useful life of the road. Here as in the Loveman case installation cost is held to create an asset which has a useful life in excess of 1 year. Petitioners' final argument is that to require them to capitalize the cost of the signs is to make an unjustified change in their method of accounting. Petitioners contend that under the provisions of section 446 [16] their income is to be computed under the method of accounting on the basis of which they regularly keep their books unless that method does not clearly reflect their income. Petitioners contend that their *237 method of accounting used at least since 1930 of charging cost of signs to current advertising expense does clearly reflect their income, and therefore respondent is not justified in requiring a change in their accounting method. Respondent in his brief concedes that his adjustments have in effect required a change in petitioners' accounting method, but argues that such change is necessary to clearly reflect petitioners' income. Under the facts in this case, it is not as clear to us as apparently it is to the parties that respondent's adjustment did cause a change in petitioners' accounting method. This record indicates that the signs which petitioners had installed prior to sometime in 1961 had been the smaller, less durable type of signs. It may well be that *238 those signs did not have a useful life of more than 1 year. In any event there is nothing in this record on which a finding might be based that the signs which petitioners had placed on the property of their dealer-customers in the years prior to 1961 did have a useful life of more than 1 year. However, since both parties apparently agree that respondent's adjustment did constitute a change in petitioners' accounting method we will consider whether under the facts here shown the change is necessary to clearly reflect petitioners' income. If the signs installed by petitioners prior to the years here in issue did have a useful life of more than 1 year, then respondent's adjustment would constitute a change in the treatment of a material item and therefore a change in petitioners' method of accounting within the meaning of section 446. Oberman Manufacturing Co., 47 T.C. 471 (1967). We, therefore, must determine whether petitioners' income for the years here in issue is clearly reflected if they deduct as advertising expenses costs of signs which have a useful life of at least 5 years and which serve petitioners' advertising purposes during their 5-year useful life. Even though a taxpayer *239 has used a specific method of accounting for a period of years, respondent is justified in requiring a change in that method where it does not clearly reflect income. Caldwell 658 v. Commissioner, 202 F. 2d 112 (C.A. 2, 1953), affirming on this issue a Memorandum Opinion of this Court; and Ezo Products Company, 37 T.C. 385, 391 (1961). See also Fort Howard Paper Co., 49 T.C. 275, 284 (1967), and cases there cited. Our question here is therefore not how long petitioners may have been deducting costs of signs as advertising expense but rather, is it necessary that these costs be capitalized in order to clearly reflect petitioners' income. As we have pointed out in discussing whether respondent was correct in his determination that petitioners were required to capitalize the cost of signs, it has long been recognized that expenditures by a taxpayer for items which are capital in nature and result in an economic benefit to the taxpayer extending beyond the taxable year in which the expenditure is made are capital expenditures. Amounts of capital expenditures are not deductible in one year but recovered through depreciation or amortization over the useful life or the time during which *240 the taxpayer receives economic benefits from the expenditures. In order to clearly reflect petitioners' income it is necessary that their capital expenditures for signs be recovered through amortization over the 5-year useful life of the signs which is the minimum period during which the expenditure benefits petitioners. Respondent's regulations under section 446 (Income Tax Regs. section 1.446-1 (a)(4)(ii)) [17] *241 specifically states that "expenditures made during the year shall be properly classified as between capital and expense." Therefore we conclude that petitioners' income is not clearly reflected unless the costs of signs are capitalized. If respondent's adjustment in this regard is a change in petitioners' accounting method, such change is necessary in order to clearly reflect petitioners' income. We therefore sustain respondent's determination capitalizing petitioners' costs of signs, clocks and scoreboards including the installation costs. Accumulated Earnings Tax Issue The second issue in this case relates only to Hygeia. Respondent has determined that Hygeia is subject to the accumulated earnings tax imposed by section 531. Section 532 [18] *242 provides that every corporation formed or availed of for the purpose of avoiding income tax with respect to its shareholders or the shareholders of any other corporation by permitting earnings and profits to accumulate instead of being distributed shall be subject to the tax on accumulated earnings imposed by section 531. Section 533 [19] provides that for the purpose of section 532 the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid income tax with respect to shareholders unless the corporation by a preponderance of evidence shall prove to the contrary. While section 533 does not contain a statement with respect to the inference to be drawn from a showing that earnings and profits have not been accumulated beyond the reasonable needs of the business, the provisions of section 535 [20] *244 that for 659 the purpose of determining accumulated taxable income such taxable income is to be adjusted by an accumulated earnings credit equal to an amount of the earnings and profits for the taxable year retained for the reasonable needs of the business makes any such statement *243 unnecessary. To the extent earnings and profits are shown to be accumulated for the reasonable needs of the business, the accumulated earnings income is reduced. Therefore, if it is shown that the entire earnings and profits are retained for the reasonable needs of the business there is no accumulated earnings taxable income to be subject to the tax. When some portion of but not all of the accumulation is necessary for reasonable needs of the business, we must determine the amount of the accumulated earnings income and whether that income is subject to the accumulated earnings tax because of the corporation being formed or availed of for the purpose of avoiding income tax with respect to its shareholders. Section 537 [21] *245 provides that for the purpose of the accumulated earnings tax, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business. In the instant case there is no contention by respondent that Hygeia was formed for the purpose of avoiding income tax with respect to its shareholders. Respondent's contention is that in the years here in issue it was availed of for that purpose. The evidence in this case and the argument of the parties deals entirely with the issue of whether the earnings and profits of Hygeia were permitted to accumulate beyond the reasonable needs, including the reasonably anticipated needs, of Hygeia's business. The main argument of the parties concerns whether Hygeia had sufficiently definite plans to build and equip a new plant to justify retaining its earnings for that purpose. The proposed new plant which Hygeia was to build was to cost when equipped very close to two million dollars. It is therefore readily apparent that the reasonable needs for this project were in excess of Hygeia's total accumulated earnings, including current accumulations in each year here in issue. The parties, however, do join issue with respect to other needs of Hygeia's business and for this reason before we reach the issue with respect to the building of a new plant by Hygeia, we will briefly discuss *246 the other arguments of the parties. Hygeia argues that because of the new products it was adding to its line, it had need of funds for the purchase of new equipment. In a general way the record shows such a need. However, the evidence shows that in each year here in issue Hygeia had sufficient accumulated earnings and profits at the beginning of the year to meet any need of purchasing new equipment aside from the new equipment which would be needed in its new plant which need we will consider in connection with the issue of the new plant. The evidence shows that of the years here in issue only in 1963 was Hygeia's gross addition of fixed assets in excess of the amount of its depreciation deductions with respect to its existing fixed assets. In that year the excess was less than $200,000 as compared to accumulated earnings as of that year of over $1,400,000. Respondent in his brief sets forth a mathematical computation in regard to equipment purchases, depreciation deductions taken, payments on notes for fixed assets, cash payments on fixed assets and notes given for fixed assets. From this computation respondent concludes that there was no deficiency in the fixed asset account for *247 1962 and 1963 and that the deficit of $195,714.37 which he computed for 1964 was far less than Hygeia's accumulated earnings and profits as of the beginning of the year 1964. While we agree with petitioners that some details of respondent's computations might be refined, we agree with respondent that the evidence shows that Hygeia had no need in the years here in issue to accumulate its earnings and profits further for the purchase of equipment for its presently existing plant. The next argument between the parties concerns the reasonable need of petitioner 660 for working capital. From the facts we have set forth in our findings it is apparent that considering the notes receivable from Hygeia's officers, including Crawford, and Hygeia's cooler receivables and cooler inventories as current assets, Hygeia's current assets exceed its current liabilities by the amounts of $690,684.13, $644.032.41, and $561,274.14 for the years 1962, 1963, and 1964, respectively. It is highly questionable whether cooler receivables and cooler inventories should be included in current assets. As we have set forth in our findings of fact Hygeia's cooler receivables represented amounts due it from its customers *248 to whom it had sold coolers on a 5-year installment basis. The cooler inventories were coolers either held for sale to such customers or held for lease. Therefore, in reality cooler receivables and cooler inventories, are not current assets except to the extent of the amount due to petitioner in the current year. Respondent in his brief in determining petitioner's working capital needs, suggests that four-fifths of the cooler receivables be considered as additional need for working capital to carry these receivables. This adjustment would have substantially the same effect as eliminating four-fifths of the amount from current assets as far as need for working capital is concerned. If four-fifths of the cooler receivables are to be considered to be needed by Hygeia for working capital, then four-fifths of Hygeia's cooler inventories should also be considered as needed working capital. Respondent in his brief has a detailed computation of Hygeia's need for working capital which he states is in accordance with the "formula" contained in Apollo Industries, Inc. v. Commissioner, 358 F. 2d 867 (C.A. 1, 1966), remanding 44 T.C. 1 (1965). Some of the figures in this computation are readily *249 apparent and are contained in our facts. Respondent does not inform us of the source of other figures and we have been unable to locate in the record respondent's figure for annual direct and indirect operating costs excluding depreciation. However, we have set forth in our findings the information shown in the record which would permit a computation such as was made in the recent case of Magic Mart, Inc., 51 T.C. 775 (1969) if we had available proper inventory figures. The inventory figures which are in the record and which respondent apparently used in his computation are the inventories for December 31 of each of the years 1962, 1963, and 1964 which are in the respective amounts of $67,446.57, $81,630.02, and $76,744.14. Respondent states that he has arrived at an average inventory by averaging the opening and closing inventory of each year. He thus arrived at such an average inventory figure of $73,817 for 1962, $74,548 for 1963 and $79,187 for 1964. While we do not find the 1961 closing inventory in the record in order to determine the average inventory for 1962 as respondent has determined it, petitioner does not contest this figure as such and the other figures as found by respondent *250 are the average of the ending inventory for the previous year with the ending inventory for the current year. However, there are two basic fallacies in the use of these inventories. The record shows that Hygeia's business was very seasonal. Its high months were the summer months of June, July, and August, and the winter months were its very lowest time for production and sales. In fact its president testified that in the winter months it operated at such a reduced level as to actually sustain a loss. In the spring it was necessary for Hygeia to accumulate as much inventory as feasible for its high sales in the summer months. The average inventory as used by respondent coming at December 31, would logically be Hygeia's lowest inventory. As we pointed out in Magic Mart, Inc., supra, if a computation is to be made of the inventory turn-over in order to determine a need for working capital, the peak inventory of the year should be used. In the instant case respondent used the low inventory of the year. No weight can be given to a computation containing this fallacy. The second fallacy is that respondent used only the cost of materials for the cost of goods sold. How much of the operating *251 costs should properly be a part of cost of goods sold is not clearly shown by the record. There are in evidence Hygeia's audit statements for each of the years 1962, 1963, and 1964, which show the cost of manufactured goods sold to be $1,187,405.60, $1,328,256.63, and $1,457,619.30, respectively. [22] *252 If the total 661 inventories are divided into cost of goods sold as shown on the audit statements or the inventory of merchandise bought for manufacture is divided into the merchandise purchased for sale each year, the result obtained is a turn-over-period of 2 to 3 weeks. Hygeia's president testified that the Corporation's average turn over period was 2 to 3 weeks but that the period required for a turn over was much longer at its high season of the year as summer approached. A comparison of the results of the computations made by respondent with this testimony indicates that in this case a computation of this type is meaningless. Respondent proceeds to make a computation based on accounts receivable as shown at the very lowest period of the year with an average number of days in which accounts receivable are tied up being shown as 6 days for 1962, 8 days for 1963, and 9 days for 1964. Again, the testimony shows that through the years petitioner's charge sales were increasing. This testimony is borne out by the increase in each of the years as shown by the balance sheets which we have set forth in our findings in accounts receivable even at the very lowest season of petitioner's business, December 31 of each year. If any reasonable computation is to be made it would be necessary to make that computation on the basis of petitioner's accounts receivable at the height of its business season in June, July and August. In the case of Magic Mart, Inc., supra, the taxpayer had no charge sales, doing a strictly cash business. In that case we used a computation of a need for working capital by using the peak inventory *253 divided into cost of goods sold to obtain an inventory turnover. We then determined what percentage of the year it took to turn over the inventory and applied that percentage to the taxpayer's cost of goods sold plus operating costs to arrive at the need for working capital. The reason for using such a system was that there was determined to be no working capital needed to carry the sales since they were for cash. In the instant case there is testimony of the constantly increasing portion of petitioner's sales which are charge sales. At one point an estimate of 50 percent of the sales being charge sales is given. However, it is not clear whether this estimate applies to 1964 or the time of the trial. For this reason we have, based on the testimony in the record, determined that Hygeia's average operating cycle was 6 to 7 weeks, being shorter in the low sales winter months and longer in the high sales summer months. Hygeia's total costs of goods manufactured and operations, which we have computed by subtracting from its total costs of goods and expenses the items of depreciation and Federal income taxes, were $1,979,365.63, $2,227,029.73 and $2,658,682.81 for the years 1962, 1963, and *254 1964, respectively. For these respective years the average weekly costs of goods manufactured and operations are $38,064.72, $42,827.49 and $51,128.51. The record shows that Hygeia's operating cycle is longer in the peak season and the clear inference from the record is that weekly expenses are greater in the peak season than in other periods. Therefore, the average weekly operating expenses multiplied by 7 results in an amount substantially less than the funds needed to carry one complete cycle of Hygeia's operations at its peak season. However, when an amount so computed is added to the four-fifths of the cooler receivables at the end of the year computed by respondent as needed to carry the cooler receivables plus four-fifths of the cooler inventories, the resultant amounts of funds needed by petitioner to finance one cycle of its operations and carry its cooler operations are $517,721.66, $594,637.83 and $649,230.75 for the years 1962, 1963 and 1964, respectively, [23] as compared with net liquid assets for these years of $690,684.13, $644,032.41 and $561,274.14, respectively. The excess of net liquid assets over the minimum funds computed as necesary to carry Hygeia's cooler operations *255 and its plant operations for one cycle in 1963 is only $49,400. In our view any reasonable adjustment for the higher costs and longer cycle at the peak period would be in excess of this amount. Hygeia's need for net liquid assets for one operating cycle and to carry its cooler operations for 1964 is in excess of its net liquid assets. In our view 662 this record shows that Hygeia in 1963 and 1964 needed all its net liquid assets to pay its material and operating costs for one cycle of its peak season and to carry its cooler receivables and inventories. We will not attempt to compute the precise amount by which Hygeia's net liquid assets exceeded its need for operating funds for one cycle of its peak period plus funds necessary to carry its cooler receivables and inventory for the year 1962, since in our view Hygeia had need for its total accumulated earnings in each year here in issue for the reasonably anticipated needs of its business of building and *256 equipping a new plant. We do not agree with respondent's argument that even though Hygeia might need its total net liquid assets for operation of its business for one cycle and for carrying its cooler receivables and inventories, it should be considered as not having any actual need for the amount because of the fact that it had amounts about equal to its net liquid assets lent to Crawford. We have considered the loans to Crawford as net liquid assets. As Hygeia points out it borrowed money for less interest than the interest it charged Crawford. Without the asset of the loans to Crawford, it might have been that Hygeia could not or would not have been willing to borrow the funds it did borrow some of which were borrowed apparently for operating funds. Section 1.537-1(b)(1), Income Tax Regs. , [24] states that in order for a corporation to justify an accumulation of earnings and profits for reasonably anicipated future needs, there must be an indication that the future needs of the business require the accumulation and the corporation must have specific, definite, and feasible plans for the use of such accumulation. The evidence here is unmistakably clear that there was a definite need *257 in Hygeia's business for a new and expanded plant. Respondent does not contend to the contrary. The evidence shows that Hygeia had converted its garages into operating space for its business and that the loading operation was inefficient because of lack of space. The record shows that trucks had to be parked across the street from Hygeia's plant in the open and also that difficulty was encountered with the trucks entering the yard particularly in heavy traffic. As new and different products were added to Hygeia's line and more storage space and larger trucks and additional equipment were needed, the need for space grew progressively worse. Before the end of the last year here in issue, Hygeia had rented a warehouse for $300 a month approximately a mile from its main plant in Pensacola to house its cooler department and to use for cooler storage and its radio headquarters. The distance of the new quarters from its main plant added further to the inefficiency of Hygeia's operations. As great as the need of Hygeia was for a new and more efficient plant, it is respondent's position that Hygeia did not have specific, definite and feasible plans for the use of its accumulated earnings for *258 a new plant. It might be pointed out that whereas the regulations refer to specific, definite, and feasible plans for the "use of such accumulation" respondent's *259 argument here is that Hygeia did not have specific and definite plans at the end of the last year here involved or during the years here in issue for the building of its plant. The two problems are different. As respondent's regulation goes on to state, "an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business," This regulation then states that where "the needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business." In the instant case the future needs of Hygeia's business were 663 definitely for a new and adequate plant. The plans for the future use of the accumulation were specifically for a new building and equipment. We, therefore, are left with the question of whether the evidence in *260 this case supports Hygeia's contention that the accumulation will be used within a reasonable time and that the execution of its plans for a new building has not been postponed indefinitely. The evidence here shows that in 1955 shortly after the first product other than the 6 1/2 ounce bottle of coca cola had been added to Hygeia's line, the question of additional space arose. The first new product, Pre-Mix for automatic dispensers, was added by Hygeia in May 1955. At that time Hygeia contemplated an addition to be made to its existing plant. Work was done toward planning such addition. Plans for the addition were drawn. In April 1958, Hygeia purchased a 15-acre tract located on a two lane not extensively traveled road with an idea of building a new plant on the tract. Shortly before making this purchase Hygeia concluded to build a new plant instead of remodeling the old plant. At that time Hygeia was aware of the possibility of adding new products and in August 1958 did in fact add King-size coca cola to its products. In January 1958 there was an increase in the price per case charged by bottlers for coca-cola. Although there was no decline in Hygeia's net income after the price increase, *261 there was a decline in its case sales. Because of this decline and also in order to give more consideration to the type of plant it would require, Hygeia in late 1958 decided against commencing building its new plant immediately. In July 1960 two additional products were added to Hygeia's line and in October 1961 an additional product was added in two sizes. Between 1958 and early 1963 no active steps had been taken by Hygeia toward planning for its new plant. Crawford had visited other plants during this period and the stockholders had considered whether to purchase land adjacent to Hygeia's Fairfield property. However, no specific plans had been worked on for the plant. In October 1959 Hygeia had made a 3-year lease of its Fairfield property. However, the lease provided that Hygeia might cancel it upon 90 days' notice. It was not until the early part of 1963 that Hygeia's officers began again to actively plan for the building of Hygeia's new plant. The reason Hygeia had delayed making specific plans for its plant for this period of time was to determine the extent to which the various new products would affect its operations and also to see to what extent case sales would resume *262 the 1958 or pre-1958 level. Case sales for 1959 were approximately the same as for 1958. In 1960 the case sales declined below the 1958 and 1959 level and Hygeia's case sales after 1959 did not reach a level higher than its 1958 level until 1963. Also by mid-1963 Hygeia had added seven products to its line although it did not manufacture the products in cans and was anticipating adding other new products. The changes which Hygeia had anticipated in 1958 which would affect the type of new plant it needed had substantially occurred by 1963. During 1963 and throughout 1964 Hygeia was actively engaged in making plans to build on the Fairfield property. There had by this time been development of a shopping center across from Hygeia's Fairfield property and the road in front of the property had been made into a foun-lane road. Hygeia in its contract of purchase of the Fairfield property had been given the right of first refusal of certain nearby property. Hygeia proceeded in 1963 and 1964 with plans for a plant for its Fairfield property with a view to acquiring some additional adjoining property. In February 1965 Hygeia listed its present Pensacola plant for sale and in early 1966 authorized *263 the architects who had previously done architectural work for Hygeia to make the preliminary architectural drawings for Hygeia's new plant. Hygeia arranged to have this architect meet with Shaw the architect of Standard who had been making preliminary plans for Hygeia's new plant. During 1966 while these plans were being worked on by Hygeia's architect, Hygeia sought to purchase property adjoining its Fairfield property, but the prices at which those properties were offered were considered excessive by Hygeia. A piece of property that it might have acquired at a reasonable amount was in a shape of a triangle and was considered impracticable for use for Hygeia's purposes. As the architect worked on plans and when drawings for the new plant were made in April 1966, it became apparent that the Fairfield property would not be adequate for the new plant without additional property and some more satisfactory method of entrance to the property for Hygeia's trucks. Further drawings were made by Hygeia's architect, and in late October he and Shaw consulted with respect to these plans. In November Shaw reported to Crawford Rainwater with respect to these consultations and pointed out eleven *264 areas in which he thought further 664 consideration should be given to the drawings for the new plant. After further consideration of the plans, in light of the inability to obtain more property at the Fairfield location and the traffic condition as it developed there particularly with respect to the then recent proposal to place Interstate 10 quite near to that property, Hygeia in late 1966 or early 1967 abandoned its plans to build on the Fairfield property. It put that property up for sale and proceeded to arrange to buy a 55-acre piece of property located well enough outside the congested section of Pensacola to be considered by Hygeia and its architects as adequate for Hygeia's proposed new plant. It contained sufficient area for expansion and for any foreseeable changes which might be made in the soft-drink bottling industry. Hygeia had purchased or completed the purchase of the new tract on February 7, 1968, only shortly before the trial later in February of this case. It was the opinion of Hygeia's officers and its architect that the plant which had been under consideration and for which drawings had been made to be placed on the Fairfield property would with some revision *265 be suitable for the new, much larger property acquired in February 1968 by Hygeia. At the time of the trial consideration was being given to adapting the plans of the plant designed for the Fairfield property to the newly acquired adequate-sized property. No plant had been built and no construction contract had been let for the plant on the recently acquired 55 acres at the date of the trial. It was stated by all witnesses, including the architect from Standard, that Hygeia was actively proceeding with its plans for a new plant. Shaw, the representative of Standard assigned to assist Hygeia, stated that the reason no billing had been sent to Hygeia for services was that the new plant was still actively under consideration. We must determine from a consideration of all of the facts of this case whether the execution by Hygeia of its plans for a new building had been postponed to such an extent that the postponement might be considered to be indefinite. We have considered the various facts here and have concluded that Hygeia did have a specific and definite plan to use its accumulated earnings for a new plant and considering the problems which had arisen from the time in the spring of *266 1958 when it began to plan for a new building until the date of the trial in this case in February 1968 a period of a little less than 10 years that the execution by Hygeia of its plans had not been postponed indefinitely. It might be pointed out that the facts in this case resemble in many respects the facts in Faber Cement Block Co., 50 T.C. 317 (1968), where an expansion plan commenced in 1957 had begun to bear fruition by the building being begun in the spring of 1967, a period of approximately 10 years. In that case, after discussing at some length the taxpayer's activity with respect to its plans for expansion and the reasons for postponement of those plans we stated: Finally, we cannot and will not ignore the ultimate fruition of petitioner's expansion plans - accomplished within a reasonable time after the years in question at a cost closely in line with the amount originally estimated. * * * The last year in issue in that case was 1963. Therefore, fruition of the expansion plans to which reference was made had begun 3 and one-fourth years after the close of the last taxable year there in issue. In the instant case the last taxable year involved is 1964, so only a little over *267 3 years had transpired between the end of that year and the date of the trial in the instant case. Likewise, in Magic Mart, Inc., supra, we recognized an accumulation as being for future needs of a business in a situation where the plans for expansion had been begun in the spring of 1957 and a building had finally been constructed by the taxpayer in 1967, 10 years later. In that case the years involved were 1959 through 1962 and the building had been completed in the latter part of July 1967. The facts here, as in Magic Mart, Inc., and Faber Cement Block Co., supra, show difficulties encountered with respect to consummating expansion plans which caused deferment of those plans for adequate reasons. The only real distinction between the Faber Cement Block Co. case and the Magic Mart, Inc. case and the instant case in regards to expansion plans, is that at the time of trial of the instant case no building had been built and the construction had not begun. We have given much consideration to the fact that in the instant case construction had not started whereas in the recent Faber Cement Block Co. and Magic Mart, Inc. cases construction had started at the time of trial. We have also *268 considered numerous other cases involving proposed expansion plans. From our consideration of the evidence here we 665 are persuaded that Hygeia did intend and had reasonably definite plans to build a new building in the reasonably near future and that a new building was a reasonably anticipated need of its business. Respondent's regulations, on which he relies in this case do not require the consummation of the plan "within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the buisness." Considering all of the facts and circumstances of Hygeia's business, particularly the constant changes which took place in the number of products it manufactured, the storage space it needed because of this, and the change in nature of its equipment because of these changes, we conclude that the evidence in this case shows that the accumulation will be used, within a reasonable time after the close of the taxable years here involved to build and equip a new plant for Hygeia. We recognize that our problem would be simpler had Hygeia broken ground for *269 the plant on its newly acquired acreage at the time of the trial in this case. Had that been the situation this case would have been on allfours with Faber Cement Block Co. and Magic Mart, Inc. However, at the time of trial adequate acreage for the plant had been acquired and Hygeia was actively proceeding with its plans to build. As the evidence in this case stands, we are persuaded that Hygeia had definite and feasible plans to use its accumulated earnings within a reasonable period after the close of the taxable year to build its needed new plant. Respondent points to the fact that in late 1962 or early 1963 a revenue agent investigating Hygeia's income tax liability for the years 1959, 1960, and 1961 suggested to the certified public accountant engaged by Hygeia that an accumulated earnings tax with respect to Hygeia's earnings for those years might be proposed. However, we are persuaded that the activity with respect to the new building which transpired in the years 1963 and 1964 and on through to the date of the trial of this case was not some window dressing because of the proposed accumulated earnings tax but was in fact real activity because of definite plans to build a *270 new building. By the date of the trial Hygeia had paid its independent architect over $15,000, had used substantial services of Standard for which it would be required to pay when the new building was built, and had bought a piece of land for its new building of approximately 55 acres. Also, its officers had spent time in connection with the new building. In light of the fact among others that beginning in 1964 and continuing thereafter Hygeia had rented operating space which was a distance of as much as a mile away from its main plant and had thereby substantially decreased the efficiency of its operations, we are of the opinion that Hygeia's activity with respect to its new building was real and was not caused by any proposed accumulated earnings tax. Respondent argues extensively that we should consider the loans which Hygeia made to its officers, particularly the loans to Crawford Rainwater, which by the years here in issue had accumulated to close to $600,000 as an indication of a lack of need by Hygeia for its accumulated earnings. We are, of course, aware of the numerous cases that give consideration to loans to officers in determining whether a corporation is subject to the *271 accumulated earnings tax. Most of the cases consider the loans to officers in connection with the determination of whether the corporation is formed or availed of for the purpose of avoiding income tax with respect to its shareholders. It has been recognized in a number of those cases that where an officer, and particularly where an officer-stockholder of a corporation, withdraws the corporate earnings in the form of loans, the indication is rather pronounced that the earnings of the corporation are being accumulated in order to avoid income tax with respect to the shareholders. See Kerr-Cochran, Inc. v. Commissioner, 253 F. 2d 121, 125, 127 (C.A. 8, 1958), affirming a Memorandum Opinion of this Court. Respondent argues that the loans by Hygeia to Crawford Rainwater demonstrate that Hygeia had adequate working capital and also that Hygeia did not have any intent to proceed with its new building in the reasonably near future. We have previously discussed our view of the relationship of the loans to Hygeia's needs. The record shows that the demand notes would be collectible on demand and therefore the funds represented by the notes were available to Hygeia as they were needed to build *272 its new plant. Hygeia's board of directors passed on the loans. Over onethird of the stock of Hygeia was owned by persons who were merely cousins of Crawford and some other stock was owned by a trust, the trustee being Edward S. Perkins, who appears to be, though the record in this respect is not completely clear, the husband 666 of one of Crawford's cousins who was a stockholder. Perkins was also a member of the board of directors that approved the loans to Crawford. Certainly, with approximately 40 percent of the stock owned by persons no more closely related to Crawford than cousins and another 175 shares of such stock owned by the mother of these cousins, thereby making Crawford's cousins and their mother own a majority of the stock, the loans were not being made to Crawford with any thought except that the money be repaid to Hygeia upon Hygeia's demand for payment. While any non-business investment of funds is some indication of excess funds, at least funds in excess of needed operating capital, this situation is not in fact present in the instant case, except that it might be said Hygeia could have borrowed operating funds even if it had not had outstanding loans to Crawford. *273 This may or may not be the fact. However, when Hygeia builds its building it will need the funds which it now has outstanding in loans to Crawford. From consideration of all the facts of record we conclude that Hygeia's entire accumulation of earnings was for the reasonably anticipated needs of its business for a new plant which when built would cost with equipment close to 2 million dollars. Having reached this conclusion we do not face the question of whether the earnings of Hygeia were permitted to accumulate instead of being distributed to its stockholders in order to avoid surtax on its shareholders. Decision will be enterd under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Beaumont Coca-Cola Bottling Company, Docket No. 6101-66 and Hygeia Coca-Cola Bottling Company, Docket No. 6303-66.↩
2. The deficiency determined for this petitioner included an accumulated earnings tax under section 531, I.R.C. 1954↩, in the amounts of $24,437.19, $24,945.24 and $39,757.43 for the years 1962, 1963 and 1964, respectively.
3. The parties agreed that the handling of advertising and use of signs, scoreboards and clocks was similar by all petitioners and that the evidence with respect to one petitioner's activities in regard to use of these items could be applied to all petitioners.↩
4. In years prior to those here in issue petitioners had entered into written contracts with retailers to the effect that the sign remained petitioners' property. However, when one retailer vacated premises and another took over, attempts to enforce these written contracts resulted in some unpleasantness and loss of retailer goodwill, so petitioners ceased the use of such written contracts.↩
5. Although tacker signs were still in use in the years here in issue, the costs of such signs are not included in the amount of petitioners, claimed deductions which remain in issue in this case.↩
6. Petitioner was reimbursed for these two signs.↩
7. These deductions are not in issue in this case since respondent recognizes them as proper expense deductions.↩
8. In 1962 the amount claimed for such expenses was $4,795. However, the parties agreed that $1,915 of the amount claimed as a deduction represented the cost of two scoreboards on which petitioner received a reimbursement which was included in its income for 1962, thus offsetting the deduction leaving only the amount of $2,880 in issue.
9. These amounts of amortization reflect an adjustment to eliminate the cost of the two scoreboards for which petitioners received reimbursement.↩
10. The stipulated figure for the amounts of the costs of these items is $2,629.10, making a discrepancy from the statutory notice of $4.00.
11. All references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
12. Upon motion of petitioner at the trial the Court ruled that the burden was upon respondent to show that Hygeia's total accumulated earnings and profits were not needed for its new plant and for new equipment but that the statement was not sufficient with respect to other items to place any burden of proof on respondent. Detailed evidence of Hygeia's actions and plans was introduced at the trial. In this state of the record the question of "who has the burden" is no longer of any consequence.
1. Beaumont's stock was owned as follows: 68 1/3 percent by Charles V. Rainwater Trustee Estate of Blanche Edmondson Rainwater, 31 2/3 percent by Charles V. Rainwater ↩
2. The beneficiaries of this trust are Charles V. Rainwater 2/5 and his sons Crawford, Brown and Veazey, Jr., 1/5 each.↩
1. The year the DeFuniak Springs plant was built.↩
13. The Statutory Notice of Deficiency listed dividends for 1964 of $100,000 to arrive at the figure of $131,837.49 of current earnings and profit retained. The income tax return for Hygeia for the year 1964 listed cash distributed as $100,000.↩
1. The additional income for Crawford Rainwater in each of the three years would be overcome by a net operating loss deduction.
1. These amounts represent installment payments due Hygeia by its dealer-customers for coolers sold to them on installments extending over periods of 5 years. Except to the extent that Hygeia might discount these receivables with a finance company if it chose to transact its operations in that manner, these amounts are not truly current notes except for the payments due in the current year. 2. These amounts are the amounts actually paid during each of the years. The amounts of the current notes and mortgages payable in less than one year per the returns are $142,500.00, $270,000.00 and $175,000.00 in the years 1962, 1963 and 1964, respectively. ↩
3. These figures actually represent remaining total notes payable.↩
1. Cost of merchandise sold was computed as follows: ↩
Invt. at beg. of yr.
$60,984.67
$33,663.68
$38,150.45
Mdse. bought for manufacture 698,747.50
830,357.28
873,753.76
Total
759,732.17
864,020.96
911,904.21
Less invt. at end of yr. -33,663.68
-38,150.45
-35,176.43
Cost of Goods Sold
$726,068.49
$825,870.51
$876,727.78
2. For 1962 and 1963 these amounts were reduced by investment credits of $9,593.81 and $17,276.50, respectively, leaving net amounts of $152,528.78 and $126,472.27, respectively.↩
14. SEC. 162, I.R.C. 1954. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * * 15. SEC. 263. CAPITAL EXPENDITURES. (a) General Rule. - No deduction shall be allowed for (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * *↩
16. SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING. (a) General Rule. - Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. * * * (d) Taxpayer Engaged in More Than One Business. - A taxpayer engaged in more than one trade or business may, in computing taxable income, use a different method of accounting for each trade or business.↩
17. Sec. 1.446-1(a)(4)(ii), Income Tax Regs.
(ii) Expenditures made during the year shall be properly classified as between capital and expense. For example, expenditures for such items as plant and equipment, which have a useful life extending substantially beyond the taxable year, shall be charged to a capital account and not to an expense account.
18. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. - The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. 19. SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose. - For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.↩
20. SEC. 535. ACCUMULATED TAXABLE INCOME. (a) Definition. - For purposes of this subtitle, the term "accumulated taxable income" means the taxable income, adjusted in the manner provided in subsection (b), minus the sum of the dividends paid deduction (as defined in section 561) and the accumulated earnings credit (as defined in subsection (c)). * * * (c) Accumulated Earnings Credit. - (1) General rule. - For purposes of subsection (a), in the case of a corporation other than a mere holding or investment company the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business, minus (B) the deduction allowed by subsection (b)(6). For purposes of this paragraph, the amount of the earnings and profits for the taxable year which are retained is the amount by which the earnings and profits for the taxable year exceed the dividends paid deduction (as defined in section 561) for such year. * * * (4) Accumulated Earnings and Profits. - For purposes of paragraphs (2) and (3), the accumulated earnings and profits at the close of the preceding taxable year shall be reduced by the dividends which under section 563(a) (relating to dividends paid after the close of the taxable year) are considered as paid during such taxable year.↩
21. SEC. 537. REASONABLE NEEDS OF THE BUSINESS. For purposes of this part, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business.
22. The cost of goods sold used by respondent is only the cost of merchandise bought for manufacture. We have set forth in our findings a computation which shows that the item entitled "cost of goods sold" on Hygeia's returns is actually the cost of merchandise bought for manufacture and does not include even the direct labor applicable to the manufacture of these goods. Respondent in his computation used the "cost of goods sold" shown on Hygeia's income tax returns.
23. The computation is: ↩
1962
1963
1964
7 weeks operating expense
$266,453.04
$299,792.43
$357,899.57
4/5 of cooler receivables
191,483.00
232,930.00
242,560.00
4/5 of cooler inventories 59,785.62
61,915.40
48,771.18
$517,721.66
$594,637.83
$649,230.75
24. Sec. 1.537-1 Reasonable needs of business. (b) Reasonable anticipated needs. (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business. * * *↩